# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-11500 |
| | ) | |
| Physiomatrix, Inc., | ) | Hon. John C. O'Meara |
| Genex Physical Therapy, Inc., | ) | |
| Kallil I. Kazan, D.C., | ) | Magistrate Judge David R. Grand |
| Naim Khanafer, D.C., | ) | |
| Sami Abu Farha, M.D., | ) | |
| Sami Abu Farha, M.D., P.C., | ) | |
| Tete Oniang'o, M.D., | ) | |
| Tete Oniang'o, M.D., P.L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

## STATE FARM'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS ISSUED TO NONPARTIES IYETEK, COMCAST, U.S. POSTAL SERVICE, WEINER & ASSOCIATES, LAW OFFICES OF MICHAEL J. MORSE KENNETH JACKSON, & K JACKS INVESTIGATIVE CONSULTING

State Farm Mutual Automobile Insurance Company ("State Farm"), pursuant to Rules 26 and 45 Fed. R. Civ. P., moves for an order compelling: (1) Iyetek, L.L.C., (2) Comcast Corporation, (3) the United States Postal Service (4) Weiner & Associates, PLLC, (5) the Law Offices of Michael J. Morse, P.C., (6) Kenneth Jackson, and (7) K Jacks Investigative Consulting, LLC, all non-parties to this action, to produce documents responsive to lawfully issued subpoenas. In support, State Farm relies on the accompanying brief and exhibits.

Respectfully submitted,

Dated:  August 1, 2013                By:/s/ Ross O. Silverman

Morley Witus                          Ross O. Silverman
Barris, Sott                          Kathy P. Josephson
211 W. Fort Street Suite 1500         Eric T. Gortner
Detroit, MI 48226-3281                Patrick C. Harrigan
313-965-9725                          KATTEN MUCHIN ROSENMAN, LLP
mwitus@bsdd.com                       525 W. Monroe Street, Suite 1600
                                      Chicago, Illinois 60661-3693
                                      (312) 902-5293
                                      ross.silverman@kattenlaw.com
                                      kathy.josephson@kattenlaw.com
                                      eric.gortner@kattenlaw.com
                                      patrick.harrigan@kattenlaw.com
                                      ATTORNEYS FOR STATE FARM

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-11500 |
| | ) | |
| Physiomatrix, Inc., | ) | Hon. John C. O'Meara |
| Genex Physical Therapy, Inc., | ) | |
| Kallil I. Kazan, D.C., | ) | Magistrate Judge David R. Grand |
| Naim Khanafer, D.C., | ) | |
| Sami Abu Farha, M.D., | ) | |
| Sami Abu Farha, M.D., P.C., | ) | |
| Tete Oniang'o, M.D., | ) | |
| Tete Oniang'o, M.D., P.L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

# BRIEF IN SUPPORT OF
# STATE FARM'S MOTION TO COMPEL
# COMPLIANCE  WITH SUBPOENAS ISSUED TO
# NONPARTIES  IYETEK, COMCAST, U.S. POSTAL SERVICE,
# WEINER & ASSOCIATES, LAW OFFICES OF MICHAEL J.  MORSE
# <u>KENNETH JACKSON, & K JACKS INVESTIGATIVE CONSULTING</u>

## STATEMENT OF ISSUES PRESENTED

1. Whether crash report vendor Iyetek should be compelled to comply with State Farm's February 8, 2013 subpoena in this case by producing documents that will identify who was purchasing traffic crash reports through an account established in the name of a fictitious entity, Auto Assurance, to illegally solicit car accident victims to treat at the defendant clinics, Physiomatrix and Genex.

2. Whether crash report vendor Iyetek should be compelled to comply with State Farm's June 3, 2013 subpoena in this case by producing invoices and monthly statements reflecting the purchases of traffic crash reports by certain law firms to illegally solicit car accident victims to be represented by the law firms and/or to treat at the defendant clinics, Physiomatrix and Genex.

3. Whether Comcast should be compelled to comply with State Farm's subpoena in this case by producing documents reflecting the registration information used to establish the e-mail account for Autoassurance@comcast.net, which is the e-mail address used to establish accounts in the name of the fictitious entity, Auto Assurance, to buy traffic crash reports from three vendors to illegally solicit car accident victims to treat at the defendant clinics, Physiomatrix and Genex.

4. Whether the United States Postal Service should be compelled to comply with State Farm's subpoena in this case by producing documents reflecting the identity of the individuals who established and had access to PO Box 414 in Dearborn Heights, Michigan, which was used by the fictitious entity, Auto Assurance, in connection with its account to buy traffic crash reports from traffic crash report vendor DocView.

5. Whether Kenneth Jackson and his firm K Jacks Investigative Consulting, LLC, who appear to be illegally soliciting car accident victims for the defendant clinics, Physiomatrix and Genex, and/or certain attorneys who appear to have a cross-referral relationship with the defendants, should be compelled to comply with State Farm's subpoenas by producing documents relating to their communications and relationships with the defendants, patients who were allegedly treated by the defendants, crash report vendors, certain law firms, and/or government agencies.

i

6.     Whether the law firms of Michael Morse, PC and Weiner & Associates, which appear to have strong cross-referral relationships with the defendant clinics, Physiomatrix and Genex, and to illegally and unethically solicit car accident victims, should be compelled to comply with State Farm's subpoenas by producing documents reflecting their communications and transactions with the defendants and/or Kenneth Jackson, their purchases of traffic crash reports, and their settlement demands and distributions for the claims at issue in this lawsuit.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

Cable Communications Policy Act of 1984, 47 U.S.C. § 551(c)(2)(B) ("CCPA")

MCL § 500.4511

MCL § 500.4503

MCL § 750.410

MCL § 750.429

Fed. R. Civ. P. 26(b)(1)

Fed. R. Civ. P. 45

Michigan Rule of Professional Conduct 7.3

*Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 4507417 (E.D. Mich. 2011)

*Hancock v. Dodson,* 958 F.2d 1367 (6th Cir. 1992)

*In re Search Warrant¸* 173 F.3d 429 (6th Cir. 1999)

*People v. Paasche*, 525 N.W.2d 914 (Mich. Ct. App. 1994)

*Sungjin Fo-Ma, Inc. v. Chainworks, Inc.*, 2009 WL 2022308 (E.D. Mich.2009)

*State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2008 WL 5383855 (E.D. Mich. 2008)

*State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2010 WL 2287454 (E.D. Mich. 2010)

*Zoosk Inc. v. Doe 1*, 2010 WL 5115670 (N.D. Cal. 2010)

## I.     INTRODUCTION

State Farm seeks to recover from the defendants more than $1.9 million in no-fault benefits paid to clinics, Physiomatrix, Inc., and Genex Physical Therapy, Inc., ("the Clinics") that submitted fraudulent claims by intentionally providing medically unnecessary services to individuals who were in motor vehicle accidents ("MVAs").  An essential component of the Defendants' scheme involves gaining immediate access to a high volume of MVA victims before they go elsewhere for treatment, and directing them to the Clinics for medically unnecessary treatment to facilitate fraudulent claims.  Defendants engaged in this form of "ambulance chasing" primarily by: (1) using an alias of "David Maskalski" and the name of a fictitious insurance company "Auto Assurance," which were necessary to enable them to purchase thousands of traffic accident reports ("crash reports") from legitimate vendors, and to then unlawfully solicit MVA victims to treat at the Clinics; (2) maintaining *quid pro quo* cross-referral relationships with personal injury law firms that also purchased thousands of crash reports from vendors, and then unlawfully and unethically solicited the MVA victims to be represented by the law firms and to treat at the Clinics; and, (3) using a runner, Kenneth Jackson, operating under the guise of "private investigator," to unlawfully and unethically solicit MVA victims to be represented by the law firms and treat at the Clinics.

The subpoenas at issue seek information that is extremely relevant to this

critically important component of Defendants' scheme.  Indeed, in a recent case

between State Farm and Physiomatrix, Judge Colombo of the Circuit Court for

Wayne County captured the essence of the Defendants' scheme, which begins with

obtaining crash reports and soliciting MVA victims to enable the Defendants to

exploit their unlimited no-fault benefits by generating fraudulent medical claims:

> . . . I'm appalled by what happened in this case.  What we have is a
> situation involving [Redacted] and [Redacted] who were apparently
> involved in an automobile collision.  And they had a treating
> physician and we know that the treating physician never referred them
> for physical therapy at Physiomatrix.  *My inference is that*
> *Physiomatrix got a hold of the accident report in this case and*
> *solicited these people*.  And what they do is they get them to come
> into their office and they have this Dr. Tete Oniang'o there and he
> does a perfunctory examination and then starts writing prescriptions
> for physical therapy.  And so, that happened and we run up a 75, 80,
> $85,000, or Physiomatrix does, physical therapy bill.  *I personally*
> *think that this is a fraud that's going on*.

*See* Feb. 19, 2013 Order, *Physiomatrix, Inc. v. State Farm Mut. Auto. Ins. Co.*, No.

2011-006567-NF (Circuit Court of Wayne County) (attached as Ex. 1) (emphasis

added.)   Remarkably, despite overwhelming evidence to the contrary, which is

discussed below, the Clinics have repeatedly denied that they ever used anyone's

services to obtain crash reports to market their services to MVA victims, or that

they ever used the services of a marketer, solicitor, capper or drummer to procure

patients.  Exs. 2-3[1].  This misconduct by the Defendants, lawyers, and Kenneth

---

[1] Questions five and six, in Exs. 2 and 3, are examples of the Clinics' blanket denials of using crash reports or the services of individuals to market or solicit accident victims.  State Farm has at least 21 more interrogatory responses in which the Clinics make the same blanket denials.

Jackson is undoubtedly a key contributor to the Defendants' fraud scheme, as well as the troubling no-fault trends in Michigan.[2]   The information sought by State Farm will establish the full scope of the illegal and unethical means through which the Defendants and associated non-parties have obtained crash reports and solicited MVA victims to facilitate fraudulent no-fault claims in Michigan.

This brief is organized into four sections.  The first summarizes Michigan's laws prohibiting the solicitation of MVA victims.  The second discusses the evidence obtained to date establishing that the Defendants, the lawyers, and the "private investigator" described herein have violated those laws with impunity to generate patients and clients to pursue fraudulent no-fault and personal injury claims.  The third addresses the matters at issue in the seven related subpoenas that are the subject of this motion.  The fourth and final section summarizes the documents that each subpoenaed party should be ordered to produce.

## II.   MICHIGAN PROHIBITS SOLICITATION OF MVA VICTIMS

The Michigan legislature and the Michigan Rules of Professional Conduct ("MRPC") have attempted to protect MVA victims from lawyers and other opportunists who use solicitation to troll for patients and clients, seeking to profit

---

[2] According to a 2011 report commissioned by the Michigan Chamber of Commerce, the average cost of a no-fault claim in Michigan in 2010 was more than double the second highest cost no-fault state (New Jersey), and over three times the average cost of no-fault claims in all other no-fault states.  *See* Sharon Tennyson, Ph.D., *The High Costs of Michigan's No-Fault Auto Insurance: Causes and Implications for Reform*, Michigan Chamber Study, 2011.  Ex. 4, pp. 1-2.

from their misfortune.  An understanding of these laws provides context for the evidence described herein, the information that State Farm seeks through the subpoenas, and the objections of the subpoenaed parties.

Several laws and rules of professional conduct prohibit solicitation of MVA victims.  For example, MCL § 750.410 makes it a crime for

> a person . . . or any . . . agents . . . of any such person  . . . to directly or indirectly, individually or by agent . . . solicit a person injured as the result of an accident . . . for the purpose of representing that person in making a claim for damages or prosecuting an action . . . arising out of a personal injury claim  . . . or to employ counsel for the purpose of that solicitation.

MCL § 750.410(1).  It is also a crime to "participate in, or aid or abet a violation of this section."  *Id.*  Furthermore, contracts resulting from such solicitations are void. *Id.*  Reflecting the seriousness of these prohibitions, this statute also imposes criminal liability on "any person . . . who, for any consideration and without the prior written permission of a patient or his or her personal representative, furnishes, receives, buys, offers to buy, sells, or offers to sell, directly or indirectly, the identity of the patient."  MCL § 750.410(2).

Important public policy concerns underlie the solicitation prohibitions in the above statute.  Indeed, in *Woll v. Kelley*, 409 Mich. 500 (1980), the Michigan Supreme Court rejected a constitutional challenge to MCL § 750.410 and listed the State's interests in avoiding "evils associated with 'ambulance chasing,'" including

(1) fomenting litigation with resultant burdens on the courts and public purse, (2) subornation of perjury, (3) mulcting [*i.e.*, defrauding or swindling] of innocent persons by judgments, upon manufactured causes of action and perjured testimony, and by settlements to buy peace, and (4) defrauding of injured persons having proper causes of action, but ignorant of legal rights and court procedure, by means of contracts which retain exorbitant percentages of recovery and illegal charges for court costs and expenses, and by settlements made for quick return of fees and against the just rights of the injured persons.

*Id.* at 525-26.

Similarly, MCL § 500.4511 makes it a crime for any person to commit, or conspire to commit, a fraudulent insurance act, and requires courts to notify appropriate licensing authorities if a practitioner is found guilty of either offense. MCL § 500.4511(1)-(3)   A fraudulent insurance act is one in which a person "knowingly, and with an intent to injure, defraud, or deceive . . . [e]mploys, uses, or acts as a runner, capper, or steerer with the intent to falsely or fraudulently obtain benefits under a contract of insurance."  MCL § 500.4503.

Michigan law also prohibits physicians from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  MCL § 750.429. Furthermore, MRPC 7.3 provides that "[a] lawyer shall not solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship when a significant motive for the lawyer's doing so is pecuniary gain."  The comments to MRPC 7.3 further explain that "[t]here is a potential for abuse inherent in direct contact by a lawyer with a prospective client

known to need legal services . . . .  The situation is fraught with the possibility of undue influence, intimidation, and overreaching."  MRPC 7.3 (Comment). [3]

To swiftly identify MVA victims to solicit as patients and clients, the Defendants and related law firms have paid hundreds of thousands of dollars to buy thousands of crash reports from vendors that contract with and obtain the reports from government agencies.  To ensure that the crash reports are used for legal purposes, and not by opportunists to solicit MVA victims, the report vendors generally limit access only to law firms and insurance businesses that explicitly agree to use the information for legal purposes.  As discussed below, the Defendants and law firms have nevertheless used crash reports to unlawfully and unethically solicit MVA victims to become patients and clients to profit from their no-fault and personal injury claims.

## III.   EVIDENCE OF ILLEGAL SOLICITION

This section summarizes evidence obtained to date regarding the solicitation activities of the defendants, the law firms of Michael Morse, PC ("the Morse firm") and Weiner & Associates ("the Weiner firm"), and Kenneth Jackson ("Jackson"), who has a "private investigator" license, but acts as a runner to solicit MVA victims to make no-fault and personal injury claims.  The Morse and Weiner

_____

[3] The Michigan legislature is also considering legislation making it a felony to buy crash reports within 30 days of an accident for reasons of solicitation.  (*See* Michigan House Bill No. 4770, May 23, 2013; Michigan House Bill No. 4771, May 23, 2013; and Michigan House Bill No. 4772, May 23, 2013.)

firms represent more than one-half of the represented patients who treated at the Clinics and whose claims are at issue in this suit, and Jackson appears to be a runner for Defendants and the law firms.  The evidence discussed below was obtained from crash report vendors pursuant to subpoenas in this case, and various other sources, including sworn testimony from 20 MVA victims who treated at the Clinics and were solicited by the Defendants and/or the Morse or Weiner firms.

## A.      Information Obtained From Crash Report Vendors

State Farm has obtained information from three crash report vendors, Iyetek, DocView and CLEMIS, which establishes that since 2009 the Defendants, and the Morse and Weiner firms, have paid hundreds of thousands of dollars to purchase thousands of crash reports, and have unlawfully and unethically used those reports to solicit MVA victims to treat at the Defendants' Clinics and/or retain the law firms to make no-fault and personal injury claims.  As set forth below, Defendants used a fictitious insurance company "Auto Assurance" and name, "David Maskalski" to fraudulently establish customer accounts with these vendors without which the Defendants would not have been given access to crash reports.

### 1.      Crash Report Vendor Iyetek

State Farm served two subpoenas on Iyetek.  Both are at issue in this motion.

### a.   The February 8, 2013 Subpoena to Iyetek

On February 8, 2013, State Farm served a subpoena on Iyetek seeking communications and transactions with Defendants and documentation of the purchases of specific crash reports for many claims at issue in this case.  Ex. 5. Iyetek produced responsive documents, but redacted information that should have been produced, as it is relevant to prove that Defendants used false information to obtain and use crash reports from Iyetek to illegally solicit patients.

Pursuant to the subpoena, Iyetek produced an April 30, 2012 application for a customer account from "Auto Assurance."  Ex. 6.  It identified David Maskalski as the President, Manager and Contact for Auto Assurance.  *Id.*  The application lists the address of Auto Assurance as 15022 Michigan Avenue, Dearborn, MI, the phone number as 313/354-3161, and the e-mail as Autoassurance@comcast.net. *Id.*  The application states that Auto Assurance was in the insurance business, had been in business for two years and had three employees.  *Id.*  As explained next, this information was false. There was no Auto Assurance, the address and phone number belong to defendant chiropractors Kallil Kazan and Naim Khanafer and their Clinics, and they provided this false information to Iyetek to unlawfully obtain these crash reports to solicit MVA victims for their fraud scheme.

As a preliminary matter, there is no Auto Assurance in the insurance business in Michigan.  "Auto Assurance" was an assumed name for BG Car

Rental, Inc., which was formed in 1974 and dissolved in 1994, and was in Grand Rapids, Michigan.  Ex. 7.  No other Auto Assurance entity exists in Michigan.

Auto Assurance's address, 15022 Michigan Avenue, Dearborn, is the address of other entities associated with defendants Kazan and Khanafer who own the defendant Clinics.  Specifically, it is the registered office address of Rotana Holdings, LLC, an entity for which Kazan is both the registered agent and the Vice President, and Khanafer is a Managing Member.  Exs. 8 and 9 respectively.  This address is also used by DOCS Investments, LLC, which was formed in September 2011 with defendant Khanafer as its President and registered agent.  Ex. 10.

Auto Assurance's phone number, 313/354-3161, which was used in the Iyetek application is also associated with Kazan.[4]  Kazan used this as his phone number on the Rotana Holdings, LLC, public filings, (Ex. 8), in a State Farm claim, and in various advertisements.[5]  Exs. 12-13.

E-mails produced by Iyetek indicate that Iyetek questioned David Maskalski ("Maskalski") about the truthfulness of the Auto Assurance application, and allowed the account to be opened and used to purchase thousands of crash reports based on more lies by Maskalski. Specifically, in e-mail exchanges between

---

[4] The same number was also used by the Defendants for the Auto Assurance account with DocView, which is another crash report vendor that is discussed below.  Ex. 11.

[5] State Farm is attempting to identify the true subscriber of the Autoassurance@comcast e-mail account through a subpoena served on Comcast in this case.  Ex. 14.  That subpoena is a subject of this motion to compel and is addressed at pp. 21-22 below.

9

Maskalski and Iyetek, from May 3-24, 2012, Iyetek informed Maskalski that his account was being reviewed because Auto Assurance had no website and only appeared in connection with BG Car Rental in a business entity search.  Ex. 15. Maskalski responded that Auto Assurance had an existing relationship with another crash report vendor DocView (as discussed below, the DocView account was also obtained through fraud), that Auto Assurance expected to have a website within a month (that never happened), and that Maskalski's accountant did not feel comfortable sending Auto Assurance's articles of incorporation to Iyetek.  *Id.* Iyetek could not understand why Maskalski would be uncomfortable sending public records such as articles of incorporation, but more importantly it needed to know what type of insurance (home, auto, health) Auto Assurance provided because Iyetek only authorizes accounts for law firms and insurance agents that have a legitimate business need for the information in the crash reports.  *Id.* Finally, on May 24, 2012, Iyetek informed Maskalski that it would open a temporary account for Auto Assurance based upon assurances that Maskalski would provide corporate documents, which, it seems, he never provided.[6]

With the Iyetek account opened, the Defendants (Kazan, Khanafer and the Clinics) exploited it aggressively.  For example, Iyetek produced monthly invoices showing that, between May 2012 and February 2013, Auto Assurance was billed

---

[6] Iyetek produced no corporate records for Auto Assurance in response to the subpoena.

more than $170,000 to purchase or view more than 6,600 crash reports from Iyetek.  Ex. 16.[7]  At least 19 of those crash reports, and possibly many more, were for patients whose claims are at issue in this case.  The monthly invoices were all sent to Auto Assurance, Attn: David Maskalski, 15022 Michigan Avenue, Dearborn, Michigan, which is the address associated with Kazan and Khanafer.  *Id*.

Based on Iyetek's terms and conditions, Defendants would not have been permitted to obtain crash reports from Iyetek to solicit MVA victims had they not submitted false information to establish this account for Auto Assurance. Specifically, Iyetek's terms and conditions include: (1) all data is provided "solely for [Auto Assurance's] own internal business purposes," (2) use of the information obtained from the crash report data "shall be for only legitimate business purposes" and use of the crash report data for "any other purpose" including for "commercial solicitation purposes" is strictly prohibited, (3) the crash report data would not be used "for marketing purposes," and would not be resold or brokered to any third party, and (4) state-specific restrictions regarding access to and use of the crash reports would be honored.  Ex. 6.  Defendants violated all of these terms and conditions, illegally using Iyetek's crash report data to directly solicit MVA victims to receive medically unnecessary treatment at the Clinics to milk their No-Fault benefits and inflate the value of their personal injury claims to curry favor

---

[7] This exhibit shows one month of Auto Assurance's police report purchases from Iyetek. Invoices for other months can be provided should the Court require them.

with personal injury attorneys such as the Morse and Weiner firms with whom they had improper cross-referral relationships.[8]

In responding to State Farm's February 8, 2013 subpoena, Iyetek redacted (1) the VISA account number for the Auto Assurance account, and (2) the employer identification number for Auto Assurance.  Ex. 6 at p. 2.  Nor did Iyetek produce the cashier's check used by Auto Assurance to buy crash reports in May 2012.  Thus, as discussed below, State Farm seeks an order compelling Iyetek to produce: (1) the redacted information because the holder of the VISA account will establish who paid for the crash reports purchased by Auto Assurance and the EIN will enable State Farm to determine whether it is associated with any real entity, and (2) the cashier's check to identify the true purchaser.

### b.      The June 3, 2013 Subpoena to Iyetek

On June 3, 2013, State Farm served a second subpoena on Iyetek (Ex. 17), seeking all invoices or monthly statements for the purchase of crash reports by the Morse or Weiner firms, or the law firm of Nathan French, since 2007, which is the

---

[8] In its agreement with Iyetek, Auto Assurance also agreed not to obtain or use crash report data in violation of the federal Drivers Privacy Protection Act, 18 USC § 2721 *et seq*. ("DPPA").  Ex. 6.  The DPPA applies to personal information provided by individuals to state departments of motor vehicles, not information provided in crash reports.  However, the purposes of the DPPA are similar to Michigan's anti-solicitation laws.  Thus, it is noteworthy that the Supreme Court recently held that attorneys who use personal information from motor vehicle records to solicit clients could be subject to civil and criminal penalties under the DPPA. *Maracich v. Spears*, 133 S. Ct. 2191, 2205-08 (2013) (slip op.) (no legitimate purpose in permitting attorneys to use that information to "troll for clients").

period of the scheme at issue.[9] This information is extremely relevant based on the following evidence State Farm has obtained: (1) the Morse and Weiner firms represented more than one-half of the represented patients who treated at the Clinics whose claims are at issue in this case, (2) the Morse and Weiner firms have paid more than $135,000 to purchase more than 8,600 crash reports from DocView, another crash report vendor, since 2007 (Exs. 19-20),[10] (3) many MVA victims testified they were solicited by the Morse and Weiner firms, including several whose claims are at issue in this case (*see* summary of this evidence at pp. 16-19 below), (4) a solicitation flyer from the Morse firm captioned 855-Mike-Wins states: "WE HAVE YOUR POLICE REPORT. CALL US NOW FOR YOUR FREE COPY AND CONSULTATION" (Ex. 21), and (5) the Morse and Weiner firms refused to produce any documents responsive to State Farm's subpoenas in this case, which are at issue in this motion and are discussed below, regarding their cross-referral relationships with the Defendants, purchases of crash reports to solicit MVA victims, or use of Kenneth Jackson as a runner to solicit patients to treat at the defendant Clinics (State Farm's subpoenas to Jackson and his company are also at issue in this motion, and are discussed at pp. 27-31 below).

---

[9] Based upon monthly invoices produced by DocView, Nathan French's firm was billed over $400,000 to purchase more than 32,000 crash reports from 2007 through 2011. Ex. 18. Nathan French's law license has been suspended twice, once in November 2008 for 45 days and in July 2012 for 180 days.

[10] These exhibits show one month of the Morse and Weiner firms' crash report purchases from DocView. Invoices for the rest of the months can be provided should the Court require them.

On June 12, 2003, Iyetek objected to State Farm's June 3, 2013 subpoena on the grounds that neither it nor the law firms of Morse, Weiner, or French are parties and the information sought (monthly invoices showing crash reports purchased from Iyetek by the firms) is "highly confidential and proprietary."  (Dkt. 95.)  The fact that Iyetek and the law firms are not parties is not a basis for failing to comply with State Farm's subpoena, and Iyetek provides no evidence, argument, or authority to support its boilerplate objection that monthly invoices are "highly confidential and proprietary."  As discussed at pp. 34-35 below, State Farm seeks an order compelling Iyetek to produce these monthly invoices.[11]

## 2.      Crash Report Vendor DocView[12]

Monthly invoices produced by DocView show that from February 2009 to April 2012, Auto Assurance, through David Maskalski, paid over $140,000 to purchase more than 8,000 crash reports.  Ex. 22[13].  Importantly, these monthly invoices were sent to Auto Assurance, Attn: David Maskalski at either 4953

---

[11] They are relevant because these law firms appear to have been engaged in illegal and unethical solicitation of accident victims on a continuous basis for several years, as have the Defendants Kazan, Khanafer and the Clinics, and there appears to be a significant *quid pro quo* cross–referral relationship between the firms and these Defendants that has been vital to the success of the scheme in this case.  Therefore, State Farm is entitled to discover the full scope of the law firms' purchase and illegal use of crash reports during the period at issue in this case, and the extent to which those crash reports relate to patients who treated at the Defendants' Clinics.

[12] State Farm's subpoena to DocView is not at issue in this motion because DocView complied, but information produced by DocView is discussed because it is relevant to other subpoenas that are at issue.

[13] This exhibit shows one month of Auto Assurance's crash report purchases from DocView.  Invoices for the rest of the months can be provided should the Court require them.

Schaefer Rd. in Dearborn, Michigan, or PO Box 414 in Dearborn Heights, Michigan.[14]  *Id.*  These addresses are important because 4953 Schaefer Rd. is the address for defendant Genex, and PO Box 414 was the mailing address for a chiropractic clinic for which defendant Kazan is the registered agent and President. Ex. 24.  The phone number for Auto Assurance's DocView account, 313/354-4161, is the same number they used for the Iyetek account, which, as explained above, is a phone number frequently used by the Defendants.

Furthermore, David Maskalski and Auto Assurance used their existing relationship with DocView—albeit fraudulently obtained—to convince Iyetek to allow them to open an account and gain access to Iyetek's crash reports.

### 3.    Crash Report Vendor CLEMIS[15]

CLEMIS is a division of Oakland County's IT Department.  To obtain access to crash reports on line through CLEMIS, users must click the "Agree" box representing that they will comply with all federal, state and local laws, including provisions of the Michigan Vehicle Code.  Ex. 25.  CLEMIS informed State Farm that it could not identify the specific purchases of crash reports made by any user, but it was able to produce documentation of the purchase of 20 of the crash reports specifically identified in State Farm's subpoena.  These documents show that the

---

[14] PO Box 414 was also used by Auto Assurance and David Maskalski with Iyetek.  Ex. 23.

[15] State Farm's subpoena to CLEMIS is not at issue because CLEMIS has complied with the subpoena. It is discussed because information produced by CLEMIS is relevant to other subpoenas that are at issue.

Defendants purchased crash reports for eight specific claims identified in the subpoena, and in each instance did so before the patients began treating at the Clinics.  Ex. 26.  Four of the reports identified in the subpoena were similarly bought by the Morse or Weiner firms.  *Id*.  Where Defendants purchased the reports, they used the e-mail address Autoassurance@comcast.net that they used to fraudulently obtain accounts and crash reports from Iyetek and DocView.  *Id*.

### B.     Sworn Testimony of Solicited MVA Victims

State Farm also has sworn testimony from at least 20 MVA victims who were illegally solicited to treat at the defendant Clinics and/or be represented by the Morse and Weiner firms.[16]  Their highlighted transcripts are attached as exhibits.  Below is a summary of the testimony:

- Patient 1 testified that the Morse firm called after his MVA and arranged to meet.  Ex. 27 at 39.  He guessed that the Morse firm learned of the MVA from the ambulance service.  *Id.*  Morse referred Patient 1 to Genex.  *Id.* at 39-40.  Patient 1's MVA took place on 9/16/09, the Morse firm purchased his crash report on 9/18/09, and he began treating at Genex on 9/28/09.

- Patient 2 was represented by the Weiner firm and testified that someone she did not know called after her MVA, and an African-American male later came to her home and gave her a business card for the Weiner firm.  She then began treating with defendants Dr. Oniang'o and Physiomatrix.  Ex. 28 at 39-40.  Her lawyer from the Weiner firm instructed her not to answer any questions regarding the circumstances under which she retained the Weiner firm or was referred to Oniang'o and Physiomatrix.  *Id.* at 39-42.  Patient 2's

---

[16] The claims of Patients 3, 6, 7, 8, 9, 10, 12, 16, 17, and 18 are RICO Events 103, 111, 159, 4, 50, 124, 87, 110, 62, and 112, respectively.  The claims of Patients 1, 2, 4, 5, 19, and 20 are not RICO Events because they were the subject of ongoing state court litigation when this suit was filed or because their claims had not been filed until after State Farm filed this suit.

MVA took place on 6/29/10, her crash report was purchased by the Morse firm on 6/30/10, and she began treating at Physiomatrix on 7/1/10. The Weiner firm purchased her crash report on 9/3/10.

- Patient 3 was represented by the Weiner firm and testified that someone called her after her MVA and asked her if she wanted information about a place she could go for physical therapy if she had any problems. Ex. 29 at 35. After she asked for more information, someone else called and said she could go to Physiomatrix and then arranged for transportation there. *Id.* at 34-36. This testimony came despite earlier objections by Patient 3's attorney from the Weiner firm about discussing the circumstances under which she was contacted after her MVA. *Id.* at 28-29. Patient 3's MVA took place on 4/23/10, the Morse firm purchased her crash report on 4/27/10, and she began treating at Physiomatrix on 5/3/10. The Weiner firm purchased her crash report on 7/20/10.

- Patient 4 was represented by the Weiner firm and testified that a female called to see if he needed medical help after his MVA, and then later came to his home and referred him to Physiomatrix where he saw a "Dr. Kayzon or Kilamon" (likely defendant Kallil Kazan). Ex. 30 at 47-50. Patient 4 did not know how the caller got his name or number. *Id.* at 49. Patient 4's MVA was on 1/31/10, Auto Assurance purchased his crash report on 2/3/10, and he began treatment at Physiomatrix on 2/5/10.

- Patients 5 and 6, brothers who were represented by the Morse firm, testified that a female called and came to one of their homes to meet them after the MVA. This female then referred them to Physiomatrix. Ex. 31 at 28-36; Ex. 32 at 22-26. Patients 5 and 6 had their MVA on 12/4/10, Auto Assurance purchased their crash report on 12/7/10, and they began treatment at Physiomatrix on 12/9/10.

- Patient 7 testified that someone from Physiomatrix called her after her MVA and offered to arrange for a doctor to come to her home to treat her if she did not have transportation. Ex. 33 at 17-18. The caller arranged for "Dr. O" (likely defendant Tete Oniang'o) to come to her house and examine her. Dr. O then referred her for treatment at Physiomatrix and an MRI. *Id.* Patient 7's MVA took place on 1/7/10, her crash report was purchased by Auto Assurance on 1/12/10, and she began treating at Physiomatrix on 1/14/10.

- Patient 8 testified that someone called her cell phone after her MVA and arranged for her to treat at Genex. Ex. 34 at 23. When Patient 8 received

this call, she had not told anyone she was in an MVA and did not know why anyone was contacting her about it.  *Id.* at 23-24.  Patient 8's MVA took place on 11/1/09, the Morse firm purchased her crash report on 11/3/09, and she began treating at Genex on 11/5/09.

▪ Patient 9 testified he received a letter from Physiomatrix after his MVA, and then went for treatment.  Ex. 35 at 31-32.  He did not seek out Physiomatrix and does not know how anyone at Physiomatrix found out about his MVA.  *Id.*  Patient 9's MVA took place on 11/26/08, the Morse firm purchased his crash report on 12/1/08, and he began treatment at Physiomatrix on 12/23/08.

▪ Patient 10 testified that a man from Genex called after his MVA, said he heard about his MVA, and offered to arrange for him to be transported to Genex.  Ex. 36 at 24-26.  Patient 10 did not know and did not ask the caller how he got his number.  *Id.*  Patient 10's MVA took place on 10/29/09, the Morse firm purchased his crash report on 11/3/09, and he began treating at Genex on 11/9/09.

▪ Patient 11 testified that a man called after her MVA, suggested he was from the insurance company, and told her to go to Genex.  Ex. 37 at 53-55.

▪ Patient 12 testified that a woman called a few days after the MVA and told her she might need therapy from Genex, so that is where she went for treatment.  Ex. 38 at 29-30.  Patient 12 does not know why the woman called her or how the woman knew she needed therapy.  *Id.*

▪ Patient 13 testified that a woman called two or three days after the MVA, told him that she worked for the city and dealt with people who were in car MVAs, and said he should go to Physiomatrix to treat.  Ex. 39 at 20-23.  When Patient 13 asked how the woman found out about his MVA, the woman said she looked it up on public records.  *Id.*

▪ Patient 14 testified a woman called a day or two after his MVA, told him she knew he had an MVA and that he should go to Physiomatrix.  Patient 14 does not know how the woman got his number.  Ex. 40 at 25-27.

▪ Patient 15 testified that a few days after her MVA, a man appeared at her home, suggested he was from State Farm, that he was there to help Patient 15, and that he finds new MVA cases from a computer.  Ex. 41 at 9-11.  He offered Patient 15 money to treat at Genex, and said that she could get a lot of money if she sued the insurance company of the driver who hit her.  *Id.* at

11-12.  Patient 15 told the man she did not want money, and the most she could afford to pay Genex was $5 a month.  *Id.*  The man told Patient 15 she would not have to pay Genex any money because insurance would pay.  *Id.* at 12.  Patient 15 did not ask for treatment from Genex, but they sent transportation services to pick her up for treatment.  *Id.* at 13-14.  The boss and drivers for the transportation service gave her cash on multiple occasions to go to Genex, although she never asked for money.  *Id.* at 14-16.  They told her that this is what they do, give patients money.  *Id.*  The transportation company had an office at Genex, and the boss was an Arab male.  *Id.* at 16-18.[17]

Other MVA victims have testified that Kenneth Jackson solicited them to treat at the defendant Clinics.  Although Jackson obtained his private investigator's license in October 2010, State Farm is unaware of any evidence that he has ever performed any legitimate private investigator services for anyone.  To the contrary, there is substantial evidence that, since at least 2007, he has been an active "runner," "capper" or "steerer" as defined by MCL § 500.4501(h) because he procures clients and patients for professionals, including the defendant Clinics, and lawyers with whom they work, whose intent is to obtain benefits under insurance contracts and to assert claims against insureds and insurers for providing services to the clients and patients.  Indeed, Jackson's application for his private investigator license includes a personal reference from attorney Marc Mendelson at the Morse firm, which states that Jackson began working for the Morse firm as an independent contractor in January 2007, and his duties included "signing up

---

[17] At this time, State Farm does not have information regarding the purchase of crash reports for Patients 11-15.

clients." Ex. 42 at p. 3. Another personal reference in Jackson's license application file was from a Genex patient whose claim is represented by RICO Event 138. Ex. 42 at p. 4.

Furthermore, State Farm has obtained sworn testimony from several claimants who were illegally solicited by Jackson to treat at the defendant Clinics and/or be represented by the Morse firm, as follows:

- Patient 16 testified that following her MVA she received a call from an assistant at the Morse firm, and Jackson came to her home (it is unclear from her testimony which happened first). Ex. 43 at 13-14. Jackson then made an appointment for her to treat with Physiomatrix. *Id.* at 16-18. Patient 16's MVA took place on 9/26/10, Auto Assurance purchased her crash report on 9/27/10, and she began treating at Physiomatrix on 10/14/10.

- Patient 17 testified that Jackson called her cell phone the night of her MVA, and either said he was from State Farm or that State Farm had contacted him about her MVA. Ex. 44 at 15-16. Jackson said he knew Patient 17 had been in an MVA, and "they" were going to send her to physical therapy because she was entitled to it. *Id.* Jackson set an appointment for her to treat at Genex the next morning and arranged for a transportation company to take her there. *Id.* at 16-18. Patient 17's MVA took place on 1/11/10, Auto Assurance purchased her crash report on 1/12/10, and she began treating at Genex on 1/14/10.

- Patient 18 testified that Jackson called his mother after his MVA. Ex. 45 at 65-67. Patient 18 then called Jackson who came to Patient 18's home, told Patient 18 he heard he had been in an MVA, and through Patient 18's mother made an appointment for him to see a doctor (not the Defendants), and the doctor sent Patient 18 to Physiomatrix. *Id.* at 39 and 65-67. Jackson never told Patient 18 how Jackson knew he had been in an MVA. *Id.*

- Patient 19 testified that Jackson showed up in her hospital room after her MVA, gave her papers to fill out, and told her about the lawsuit she could file. Ex. 46 at 36-38. Jackson referred her to the Morse firm, and Marc

Mendelson from the Morse firm later called Patient 19 while she was still in the hospital.  *Id.* [18]

- ▪ Patient 20 testified that Jackson called and met with her at her home after her MVA.  Ex. 47 at 50-55.  She did not know Jackson before the MVA.  *Id.* A female from Physiomatrix also called Patient 20 and arranged an appointment for her, although she had never heard of Physiomatrix before her MVA.  *Id.*  Patient 20's MVA took place on November 30, 2010, Nathan French's firm purchased her crash report on December 2, 2010, and she began treating at Physiomatrix on December 12, 2010.  The Morse firm purchased her crash report on December 29, 2010.

### C.  Other Evidence of Solicitation

The limited documents produced to date by the crash report vendors show that Auto Assurance and/or the Morse or Weiner firms purchased at least seventy crash reports before the individuals began treating at the defendant Clinics.  Ex. 48. This activity, combined with the sworn statements and other evidence discussed above, strongly corroborate that these crash reports were used to illegally solicit individuals to treat at the Clinics.

## IV.  MATTERS AT ISSUE IN THE SEVEN SUBPOENAS

### A.  Scope of Discovery Under the Federal Rules of Civil Procedure

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Relevancy is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that bear on, any issue that is or may be in the case."

---

[18] At this time, State Farm does not have information regarding the purchases of crash reports for Patients 18-19.

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).   These broad standards of relevancy apply not just to party discovery but also to non-party subpoenas.   *See* R. 45 Adv. Comm. Note (it is "clear that the scope of discovery through a subpoena is the same as that application to Rule 34 and the other discovery rules").   Rule 45(c)(2)(i) provides that if an objection is made to a subpoena, the serving party may seek an order from the issuing court compelling production at any time.   When a person served with a lawfully-issued subpoena refuses to comply, the person may also be held in contempt of court.   Fed. R. Civ. P. 45(e); *Petit v. Diebold, Inc.*, 2010 WL 376103 at *1 (E.D. Mich. Jan. 25, 2010).

**B.**   **The Two Subpoenas to Crash Report Vendor Iyetek**

**1.**   **The February 8, 2013 Subpoena to Iyetek**

This subpoena seeks communications and transactions with the Defendants and documentation regarding the purchase of specific crash reports relating to claims at issue in this case.   Ex. 5.   Iyetek produced responsive documents, but redacted information that should have been produced because it is relevant to prove that Defendants Kazan and Khanafer used the alias "David Maskalski" and fictitious insurance company Auto Assurance to fraudulently obtain and use crash report data from Iyetek to illegally solicit patients for the defendant Clinics.

Specifically, in responding to this subpoena, Iyetek redacted (1) the VISA account number used to purchase crash reports through the Auto Assurance

account (Ex. 6), and (2) the EIN provided in the application for the Auto Assurance account with Iyetek (*Id.*).  Iyetek also did not produce a copy of the cashier's check used by Auto Assurance to pay for crash reports.  State Farm seeks an order compelling Iyetek to produce the cashier's check and the redacted information because it will enable State Farm to identify the purchase of the cashier's check and the account used, as well as the true owner of the VISA account which will, in turn, establish who paid for the crash reports purchased by Auto Assurance.  The EIN number will enable State Farm to determine whether it is associated with Auto Assurance or any other real entity.  There is no burden to Iyetek in producing this information, and State Farm is willing to accept the VISA account number subject to the terms of the protective order entered by this Court (Dkt. 106), thereby eliminating any potential confidentiality concerns.

### 2.    The June 3, 2013 Subpoena to Iyetek

Based on documents produced by DocView showing that the Weiner and Morse firms paid over $135,000 to buy over 8,600 crash reports, the sworn testimony from patients describing how they were solicited after their MVAs by both law firms, and the other evidence described above demonstrating the substantial connections between the defendant Clinics, Jackson and these law firms, State Farm served a second subpoena on Iyetek.  Ex. 17.  It seeks all

invoices or monthly statements for the purchase of crash reports by the Morse or Weiner firms, or the French's firm since 2007, the period of the scheme at issue.

On June 12, 2003, Iyetek served a boilerplate objection to State Farm's June 3, 2013 subpoena on the grounds that neither it nor the law firms are parties and the information sought by State Farm (monthly invoices showing crash reports purchased from Iyetek by the firms) is purportedly "highly confidential and proprietary." (Dkt. 95.) The fact that Iyetek and the law firms are not parties is not a basis for failing to comply with State Farm's subpoena, and Iyetek provides no evidence, argument, or authority to support its boilerplate objection that monthly invoices are somehow "highly confidential and proprietary." *See Sungjin Fo-Ma, Inc. v. Chainworks, Inc.*, 2009 WL 2022308, at *2 (E.D. Mich. July 8, 2009) (overruling objection that the information sought was "confidential [and] proprietary" without providing a "basis for sustaining these objections."); *Lowe v. Vadlamudi,* 2012 WL 3731781 at *3 (E.D. Mich. Aug. 28, 2012) (boilerplate or generalized objections "are inadequate and tantamount to not making any objection at all"); *Ritacca v. Abbott Laboratories*, 203 F.R.D. 332, 335 n.4 (N.D. Ill. 2001) ("[B]lanket objections are patently improper"). In short, there is absolutely nothing confidential or proprietary regarding the amounts paid and number of crash reports purchased by these firms through arm's-length transactions over the period of the scheme at issue in this case.

Accordingly, State Farm seeks an order compelling Iyetek to produce these monthly invoices, which are relevant because these law firms appear to have been engaged in illegal and unethical solicitation of MVA victims on a pervasive and continuous basis for several years, as have the Defendants Kazan, Khanafer and the Clinics, and there clearly appears to be a significant *quid pro quo* cross-referral relationship between at least the Morse and Weiner firms and these Defendants that has been vital to the success of the scheme in this case.  Therefore, State Farm is entitled to discover the full scope of the law firms' purchase and illegal use of crash reports during the period at issue in this case, and the extent to which those crash reports relate to patients who treated at the Defendants' Clinics.

### C.      The Subpoena to Comcast

Maskalski and Auto Assurance used the email address Autoassurance@comcast for their accounts with all three crash report vendors, Iyetek, DocView, and CLEMIS.  State Farm is thus attempting to identify the true subscribers and IP addresses for this e-mail account through the subpoena served on Comcast.  Ex. 14.  Comcast has informed State Farm that it is willing to comply with the subpoena, but requires a court order pursuant to the Cable Communications Policy Act of 1984, 47 U.S.C. § 551(c)(2)(B) ("CCPA"), before

it will produce the requested documents.  Ex. 49.  Comcast also has informed State

Farm that it will take steps to preserve the content of emails if ordered to do so.[19]

Under the CCPA, Comcast may only disclose subscribers' personally-

identifiable information to a third party "pursuant to a court order authorizing such

disclosure," and then upon notice to the customer.  47 U.S.C. § 551(c)(2)(B).

Courts routinely enter such orders when it appears that the identity of the target e-

mail account is relevant.  *See Zoosk Inc. v. Doe 1*, 2010 WL 5115670 at *3 (N.D.

Cal. Dec. 9, 2010) (granting discovery where, as here, Comcast was willing to

produce documents but requested court order pursuant to CCPA); *Warner Bros.

Records Inc. v. Does 1-14*, 555 F. Supp. 2d 1, 2 (D.D.C. 2008) (granting expedited

discovery and ordering Verizon to produce email and account documents to reveal

"the true identities of defendants").  In fact, Comcast provided State Farm with a

draft order to allow discovery of the requested information.  Ex. 49.  The Court

should enter such an Order.

---

[19] To date, State Farm has not sought the e-mails to and from this account, but intends to do so if the subscriber and IP address information confirm that this account is owned or controlled by any of the Defendants.  Accordingly, to avoid the inadvertent destruction of potentially highly relevant evidence, this motion seeks an order compelling Comcast to preserve e-mails into and from this account until further order of this Court.  If the owner of the e-mail account is already a party to this action, State Farm expects that the notice of the Comcast subpoena which was given to the parties on February 8, 2003, provided the owner with adequate notice that any emails sent or received by autoassurance@comcast.net are relevant to the litigation, and therefore must *not* be destroyed.  *See Tech. Sales Assocs. v. Ohio Star Forge Co.*, 2009 WL 728519 *12-13 (E.D. Mich., March 19, 2009) (stating that "it is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation.'") (citation omitted).

### D.      The Subpoena to the United States Postal Service

Because Maskalski and Auto Assurance arranged for most of the monthly invoices from crash report vendors Iyetek and DocView to be mailed to PO Box 414 in Dearborn Heights, and at least one of defendant Kazan's other chiropractic clinics (Great Lakes Chiropractic Clinic) used the same address, State Farm also issued a subpoena to the U.S. Postal Service ("USPS") for records to determine who rented and had access to that PO Box.  Ex. 50.  USPS asserts that federal regulations prevent it from providing post office box rental history without a "judge-signed court order that complies with 39 C.F.R. § 256.6(d)(4)".  Ex. 51.

This Court should enter such an Order to enable State Farm to determine whether it was the Defendants who were using PO Box 414 to fraudulently obtain and use crash reports from Iyetek and DocView to illegally solicit MVA victims.

### E.      The Subpoenas To Runner Kenneth Jackson and His Firm

State Farm served separate subpoenas on Kenneth Jackson and his firm K Jacks Investigative Consulting LLC (collectively "Jackson"), seeking identical categories of documents.  Exs. 52-53.  The requested documents relate to Jackson's communications and relationships with Defendants, patients who treated at the Clinics, crash report vendors regarding those patients, the Morse and Weiner firms, and/or licensing and law enforcement agencies.  *Id.*  Jackson objected to the subpoena served upon him individually, claiming that any responsive documents

are covered by the Professional Investigator-Client or Attorney-Client privileges, and the requests purportedly are overly broad and unduly burdensome.[20]  Ex. 54. Jackson offers no explanation, and cites no evidence, argument, or authority in support of any of his objections.  State Farm has requested a privilege log and an affidavit explaining why it would be overly burdensome for Jackson to respond to the subpoena.  Ex. 55.  Jackson has failed to provide either.

This Court should compel Jackson to comply with the subpoenas for six reasons.  First, his overly burdensome objections should be rejected because he has failed to offer a single fact to support them.  *See Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co*., 2011 WL 4507417, at *4 (E.D. Mich. 2011) (Lawson, J.) (responding party "cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance with the subpoena") (quoting 9A Wright & Miller, *Federal Practice & Procedure* § 2463.1, at 507);  *See also Great Lakes Transp. Holding, LLC v. Yellow Cab Serv. Corp. of Fla., Inc.*, 2011 WL 2533653, at *3 (E.D. Mich. June 27, 2011) reconsideration den., 2011 WL 2672544 (E.D. Mich. July 8, 2011) (denying motion to quash because moving parties "failed to support their 'mere assertions' that the subpoena would be unduly burdensome with facts or evidence").

---

[20] Jackson's counsel has informed State Farm that Jackson's firm objects on the same grounds.

Second, Jackson's assertions of the Private Investigator-Client and Attorney-Client privileges should be rejected because he has failed to comply with his basic obligation under Rule 45 to provide a privilege log identifying which privilege he is asserting for each withheld document, and describing the nature of each withheld document in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the assertions.   Fed. R. Civ. P. 45(d)(2)(A)(i) and (ii); *see also In re Search Warrant¸* 173 F.3d 429 at *2 (6th Cir. 1999) ("[T]hose seeking to invoke the privilege must provide the reviewing court with enough information for it to make a determination that the document in question was, in fact, a confidential communication involving legal advice"); *State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2008 WL 5383855 at *2 (E.D. Mich. 2008) ("The burden to show that a matter is not discoverable because it is privileged rests upon the party asserting privilege"); *SPX Corp. v. Bartec, USA, LLC*, 247 F.R.D. 516, 527-28 (E.D. Mich. 2008) (rejecting privilege claims because privilege log was "woefully lacking in the detail necessary" for the asserting party to sustain the claims).   Without a privilege log, it is impossible to assess his privilege assertions.

Third, even if withheld documents were covered by either of the generally asserted privileges, the crime-fraud exception should apply because there is a reasonable basis to: (1) suspect the perpetration or attempted perpetration of a crime or fraud, namely violations of the laws discussed above to fraudulently

obtain and use crash reports to illegally solicit MVA victims to treat at the defendant Clinics and be represented by the Morse and Weiner firms to make no-fault and personal injury claims, and (2) that the communications were made in furtherance thereof.  *See People v. Paasche*, 525 N.W.2d 914, 917 (Mich Ct. App. 1994); *State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2010 WL 2287454 at *5 (E.D. Mich. June 4, 2010).[21]   The first element of the exception only requires a reasonable basis to *suspect* fraud.  This standard is therefore a low one because it requires only a "basis to suspect rather than a basis to believe."  *Hawkins*, 2010 WL 2287454 at *5.  The evidence described above, combined with the Clinics' denials that they ever obtained or used crash reports or marketers to solicit MVA victims, surely meets this standard.

Fourth, Jackson obtained his private investigator's license in October 2010 (Ex. 42 at 1), and according to his license application, began working and "signing up clients" for the Morse firm as an independent contractor in January 2007.  *Id*. at 3.  Therefore, the Private Investigator-Client privilege could not possibly apply to any of his communications before October 2010, and he has no basis to assert it for the period 2007 through September 2010, which is within the period of the Defendants' scheme and the period covered by State Farm's subpoenas.

---

[21] The crime fraud exception applies even where the professional is unaware that the communication or activities are in furtherance of a crime or fraud.  *See Paasche*, 525 N.W.2d at 918, n. 6; *Hawkins*, 2010 WL 2287454 at *5.

Fifth, the Private Investigator-Client privilege is not applicable to this case because it is brought under the federal RICO statute and the general rule is that federal common law governs privileges in federal question cases. *See* Fed. R. Evid. 501 (1974 Advisory Comm. Notes state that in federal question civil cases federally-evolved rules on privilege apply since federal policy is being enforced, and in diversity cases if conflicting bodies of privilege law apply to same evidence, rule favoring reception of the evidence should be applied); *Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir. 1992) (rejecting application of Michigan physician-patient privilege in section 1983 federal question case).

Sixth and finally, State Farm is willing to accept documents from Jackson subject to the terms of the protective order entered by this Court (Dkt. 106) thereby eliminating potential confidentiality concerns.

## F.   The Subpoenas to the Morse and Weiner Firms

State Farm has subpoenaed the Morse and Weiner firms for the following documents from 2007 through the present: (1) communications with the Defendants about the patients who treated at the defendant Clinics and whose claims are at issue in this case, (2) payments to or from Defendants, including those relating to the patients at issue, (3) financial arrangements with the Defendants, (4) payments for, and agreements to purchase, police reports since 2007, including those relating to the patients at issue, (5) payments to obtain any of

31

the patients at issue as clients, (6) communications with and payments to Jackson since 2007, including payments to him regarding the patients at issue, (7) settlement demands made by their firms regarding any of these patients, and (8) disbursements of settlements for the claims of the patients at issue. Exs. 56-57.

Neither the Morse nor Weiner firms have produced a single document or any privilege log in response to the subpoenas. Their respective objections to the subpoenas should be rejected for the reasons discussed below.[22]

### 1.    Morse Firm's Boilerplate Objections Should Be Rejected

The Morse firm represented approximately one-third of the patients whose claims are at issue in this case. The overwhelming evidence of its illegal use of crash reports and Jackson to solicit MVA victims is set forth above.

The Morse firm indicated that it had no documents responsive to two categories of requested documents, namely requests nos. 4 (reflecting financial arrangements with the Defendants) and 8 (payments made to obtain any of patients at issue as clients). Ex. 58. Beyond that, the Morse firm generally asserted that the subpoena seeks documents covered by "various privileges (e.g., attorney client, medical, investigator) and privacy laws (HIPAA) and the work product rule," and

---

[22] In addition, State Farm is willing to accept documents from the law firms subject to the terms of the protective order entered by this Court (Dkt. 106), thereby eliminating potential confidentiality concerns.

is overly broad and unduly burdensome.  *Id.*  These objections should be rejected

for many of the reasons discussed in regard to the Jackson subpoenas, namely:

> (1) the firm has failed to offer a single fact to support its "overly
> burdensome" objection,

> (2) the firm has not supplied a privilege log,

> (3) even if withheld documents might be covered by any of the
> generally asserted privileges, the crime-fraud exception should apply
> because there is a reasonable basis to suspect violations of the laws
> discussed above to fraudulently obtain and use crash reports to illegally
> solicit MVA victims to treat at the defendant Clinics and to be
> represented by the Morse firm and that the communications were made
> in furtherance thereof, and

> (4) to the extent the firm is asserting a private investigator-client
> privilege it does not apply to this federal RICO case, and even if did
> apply, would not apply to any communications with Jackson before
> October 2010 when Jackson obtained his private investigator license.

Fed. R. Civ. P. 45(d)(2)(A)(i) and (ii).

## 2.   Weiner Firm's Boilerplate Objections Should Be Rejected

The Weiner firm represented approximately 20% of the represented patients

whose claims are at issue in this case. (Dkt. 1 ¶ 38.)  The overwhelming evidence

of its illegal use of crash reports to solicit MVA victims is set forth above.

The Weiner firm's response to the subpoena evolved over time, but

concluded with it not producing any documents or a privilege log.  In its initial

response, the Weiner firm agreed to produce payments to or from Defendants

dating back to 2007, any agreements with Jackson, and 1099s reflecting payments

to him.   Ex. 59.   Beyond that, it objected to producing any other requested documents based on HIPAA, its clients' privacy interests, the "proprietary" nature of requested documents, and the attorney work product doctrine.[23]

After meeting and conferring regarding these objections, State Farm offered to pay the reasonable costs of production and requested a privilege log to assess the validity of the boilerplate privileges asserted by the Weiner firm.   Exs. 60-61. Although the Weiner firm agreed to produce several other categories of requested documents in these discussions, including 1099s and written agreements with Jackson, it ultimately refused to produce any documents without a court order.

The Weiner firm should be compelled to produce the documents they agreed to produce three months ago, and its general objections should be rejected for many of the same reasons as the Morse firm's objections.   Furthermore, to the extent that there may be any HIPAA or privacy issues, this Court has entered a protective order (Dkt. 106) which will adequately address any such concerns.

Accordingly, the Court should enter an order compelling the Morse and Weiner firms to comply with the subpoenas at issue.

## V.   CONCLUSION

In conclusion, the Court should enter an order granting the motion and compelling the following:

---

[23] It represented that it had no documents reflecting financial arrangements with the Defendants. *Id.*

(1)    Iyetek (Exs. 5 and 17) should be ordered to produce: (a) unredacted documents identifying the credit card number(s) used by David Maskalski and Auto Assurance to purchase crash reports from Iyetek, and the employer identification number provided in Auto Assurance's account application, (b) the cashier's check(s) used by David Maskalski and Auto Assurance to pay for crash reports from Iyetek, and (c) all invoices or monthly statements for the purchase of crash reports by the Morse or Weiner firms, and the law firm of Nathan French since 2007 which is the period of the scheme at issue.

(2) Comcast (Ex. 14) should be ordered to (a) produce all documents regarding the registration information for the e-mail account Autoassurance@comcast.net, including the names, addresses, telephone numbers, alternate e-mail addresses, and IP addresses used for the registration and (b) preserve all e-mails to and from this account.

(3) the United States Postal Service (Ex. 50) should be ordered to produce all of the requested documents which relate to PO Box 414.

(4) Kenneth Jackson and his firm K Jacks Investigative Consulting LLC (Exs. 52-53) should be ordered to produce all the requested documents.

(5) the Morse and Weiner firms (Exs. 56-57) should be ordered to produce all the requested documents.

Dated: August 1, 2013                    By: /s/ Ross O. Silverman

Morley Witus                             Ross O. Silverman
Barris, Sott                             Kathy P. Josephson
211 W. Fort Street Suite 1500            Eric T. Gortner
Detroit, MI 48226-3281                   Patrick C. Harrigan
313-965-9725                             KATTEN MUCHIN ROSENMAN, LLP
mwitus@bsdd.com                          525 W. Monroe Street, Suite 1600
                                         Chicago, Illinois 60661-3693
                                         (312) 902-5293
                                         ross.silverman@kattenlaw.com
                                         kathy.josephson@kattenlaw.com
                                         eric.gortner@kattenlaw.com
                                         patrick.harrigan@kattenlaw.com
                                         ATTORNEYS FOR STATE FARM

35

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1</u>

Pursuant to Federal Rule of Civil Procedure 37 and Local Rule 7.1, counsel for State Farm attempted to confer in good faith with Comcast and USPS regarding the issues presented in the foregoing Motion.  Based on Comcast's and USPS's written objections to producing the requested records without a court order, State Farm filed this Motion.  State Farm also had multiple phone conferences and written communications with counsel for Iyetek, Morse, Weiner, and Jackson, each of whom did not agree to the relief sought in this Motion.


/s/ Ross O. Silverman
Attorney for Plaintiff State Farm

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2013, that a true and correct copy of the foregoing was served via the Court's CM/ECF system to the following attorneys of record for parties in this case:

**Gary R. Blumberg**
30665 Northwestern Hwy – Suite 200
Farmington Hills, MI 48334
248-254-3401
248-254-3404 (fax)
gbtrop@aol.com
Attorney for Physiomatrix, Inc., Genex
Physical Therapy, Inc.,  Kallil Kazan,
D.C., and Naim Khanafer, D.C.

**Matthew J. Hoffer**
Shafer and Assoc.
3800 Capital City Boulevard – Suite 2
Lansing, MI 48906
517-886-6560
matt@bradshaferlaw.com
Attorney for Physiomatrix, Inc., Genex
Physical Therapy, Inc.,  Kallil Kazan,
D.C., and Naim Khanafer, D.C.

**Bradley J. Shafer**
Shafer and Assoc.
3800 Capital City Boulevard – Suite 2
Lansing, MI 48906
517-886-6560
info@bradshaferlaw.com
Attorney for Physiomatrix, Inc., Genex
Physical Therapy, Inc.,  Kallil Kazan,
D.C., and Naim Khanafer, D.C.

**Peter W. Joelson**
Joelson, Rosenberg
30665 Northwestern Highway – Suite
200
Farmington Hills, MI 48334
248-626-9966
pjoelson@joelsonrosenberg.com
Attorney for Physiomatrix, Inc., Genex
Physical Therapy, Inc.,  Kallil Kazan,
D.C., and Naim Khanafer, D.C.

**David W. Warren**
Joelson, Rosenberg
30665 Northwestern Highway – Suite
200
Farmington Hills, MI 48334
248-855-2233
dwwarren@joelsonrosenberg.com
Attorney for Physiomatrix, Inc., Genex
Physical Therapy, Inc.,  Kallil Kazan,
D.C., and Naim Khanafer, D.C.

**Brendan H. Frey**
Mantese and Rossman, PC
1361 E. Big Beaver Road
Troy, MI 48083
248-457-9200
248-457-9201 (fax)
bfrey@manteselaw.com
Attorney for the Abu Farha Defendants

**Gerard V. Mantese**
Mantese Assoc.
1361 E. Big Beaver Road
Troy, MI 48083
248-457-9200
gmantese@manteselaw.com
Attorney for the Abu Farha Defendants

**Craig S. Romanzi**
Craig S. Romanzi Assoc.
2850 Dixie Highway
Waterford, MI 48328
248-674-4404
craig@romanziatnip.com
Attorney for the Oniang'o Defendants

I further certify that on August 1, 2013, that a true and correct copy of the

foregoing was served via U.S. mail to the following non-parties:

**Ben M. Gonek**
Giarmarco, Mullins & Horton, P.C.
Tenth Floor Columbia Center
101 W. Big Beaver Road
Troy, MI 48084
bgonek@gmhlaw.com
Attorney for Weiner & Associates

**I. W. Winsten**
Honigman Miller Schwartz and Cohn
LLP
2290 First National Building
660 Woodward Ave
Detroit, MI 48226
iww@honigman.com
Attorney for Michael Morse P.C.

**Justin Haas**
Haas & Goldstein, PC
31275 Northwestern HWY – Suite 225
Farmington Hills, MI 48334
248-702-6550
Attorney for Kenneth Jackson and
K. Jacks Investigative Consulting

**Deborah L. Lisy**
United States Postal Service
433 W. Harrison Street – 7th Floor
Chicago, IL 60699
312-669-5900
Attorney with U.S. Postal Service

**Comcast Legal Response Center**
Comcast Corporation
650 Centerton Road
Moorestown, NJ 08057

**Dan E. Bylenga, Jr.**
Rhoades, McKee
161 Ottawa Avenue NW
Suite 600
Grand Rapids, MI 49503
612-235-3500
Attorney for Iyetek, LLC

 /s/ Ross O. Silverman
Attorney for Plaintiff