UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

               Plaintiff,           Civil Action No. 12-cv-11500
                                    Honorable John C. O'Meara
   v.                          Magistrate Judge David R. Grand

PHYSIOMATRIX, INC. *et al.*,

               Defendants.
_____/

## ORDER ON PLAINTIFF'S MOTION TO COMPEL COMPLIANCE WITH THIRD PARTY SUBPOENAS AND THIRD PARTY KENNETH JACKSON'S MOTION TO QUASH SUBPOENA [110, 133]

Before the Court are Plaintiff State Farm Mutual Automobile Insurance Company's ("State Farm") motion to compel various third parties to comply with subpoenas issued to them by State Farm [110], as well as third-parties Kenneth Jackson and his company KJacks Investigative Consulting's (collectively "Jackson") motion to quash subpoenas issued to them and to others by State Farm seeking information about Jackson.  [133].  For the following reasons, both motions **[110, 133]** are **GRANTED IN PART AND DENIED IN PART**.

## I.      BACKGROUND

State Farm brings the instant action against several doctors and physical therapy clinics alleging, among other things, that the doctors and clinics violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*, by prescribing and treating State Farm insureds with a "predetermined protocol," which entailed the doctors generating a diagnosis and prescribing physical therapy to be carried out specifically at the clinics.  The

therapy was then conducted at the clinics using a specifically delineated and consistent protocol of treatments, regardless of the patient's actual need or condition.  At the end of a predetermined period of treatment, the insureds were allegedly referred back to the doctors who, in turn, re-diagnosed them with the same conditions, re-prescribed therapy, and re-treated them.  According to State Farm, this cycle repeated itself over and over, resulting in exorbitant medical bills that were ultimately submitted to and paid for as claims by State Farm.  State Farm alleges that the insureds did not actually require the amount of physical therapy prescribed or provided, or in some cases did not require physical therapy at all.  State Farm also alleges that some insureds were coerced – and sometimes even paid by the clinics, doctors and their representatives – to receive treatment in order to generate false and inflated charges that the doctors and clinics billed to State Farm.

State Farm alleges that copies of these bills are often submitted to personal injury ("PI") attorneys for their use in civil actions (or potential ones) against State Farm, and that "Defendants appear to have substantial *quid pro quo* cross referral relationships" with some of those attorneys.  Although not named as defendants to this action, State Farm's complaint references two particular personal injury firms, Michael Morse, P.C. ("Morse") and Weiner & Associates ("Weiner"), as having such a relationship with the Defendants.  In addition, State Farm's complaint identifies Jackson as Morse's investigator.  State Farm's complaint describes the alleged scheme in three paragraphs of its complaint:

> The success of Defendants' scheme depends heavily on the *quid pro quo* cross-referral relationships with PI Attorneys who represent patients in connection with [bodily injury] BI Claims and [uninsured motorist] UM Claims.  Specifically, the PI Attorneys are motivated to refer patients to Defendants because the PI Attorneys can rely upon Defendants' Predetermined Protocol to (a) establish an "objective manifestation" of serious impairment of bodily function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf

of the patients and their other clients, and (b) inflate the value of the BI Claims and UM Claims.   This, in turn, increases the amount of the contingency fees available to the PI Attorneys through the BI Claims and UM Claims.  At the same time Defendants are motivated to refer patients to the PI Attorneys and provide them with fraudulent bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

To illustrate, from 2007 to the present, at least 61 patients from whom the Clinics submitted bills to State Farm – or 59% of the patients who were represented by an attorney – were represented by attorney Michael Morse, who frequently represents individuals in UM or BI Claims.  In addition, from 2009 to the present, 21 patients – or 19% of patients who were represented by an attorney – were represented by the law firm Weiner & Associates.
…
Patients are often referred to the Clinics by either their attorneys or investigators who work with their attorneys.  For example, at least three patients have testified that they were referred to the Clinics by attorney Michael Morse, his law office – Law Offices of Michael J. Morse P.C. &[] The Auto Accident Claim Center – or investigator Kenneth Jackson ("Jackson") who identified himself as a representative of Michael Morse.  In at least one instance, Jackson made the appointment at [defendant] Physiomatrix for the patient.

(Cplt. ¶¶ 37-38; 50).

As a result of these allegations, and based on additional evidence gathered during the pendency of discovery in this case, State Farm issued subpoenas to Morse, Weiner, and Jackson related to their contacts with Defendants and the way they solicit and refer clients.  State Farm also issued a subpoena to Iyetek, LLC, a automobile crash report vendor, seeking billing records related to Morse, Weiner and another law firm, that of Nathan French, in order to obtain information related to the way those firms solicit clients.[1]  State Farm issued other third-party

---

[1] According to Morse's response brief, and confirmed by exhibits submitted by State Farm, at least two other crash report vendors were also subpoenaed for information relating to Morse, Weiner and possibly French.  Both complied; DocView supplied State Farm with numerous invoices related to the purchases of crash reports by the three firms, and CLEMIS supplied information related to Morse and Weiner.  Morse alleges that these subpoenas were issued and responded to without notifying Morse or Weiner, such that they were unable to timely object.  Neither Morse nor Weiner agree that these crash report vendor subpoenas should have been

subpoenas to Cellco Partnership, d/b/a Verizon Wireless; Sprint, T-Mobile USA, Comerica

Bank, IDT, TracFone; PNC Bank; Bahiya Fawaz, C.P.A., P.C., and Paramount Accounting

Services, all of which Jackson seeks to quash to the extent they seek his information.   In

addition, based on evidence adduced during discovery regarding an allegedly fictitious entity,

Auto Assurance, which State Farm alleges was created by at least some Defendants to legally

purchase automobile crash reports and solicit patients, State Farm issued subpoenas to Comcast

and the United States Postal Service ("USPS") seeking to obtain the identity of the owner of a

specific email address and post office box, respectively, associated with that entity.   Each

subpoena has been objected to either by the receiving party or by the third-party whose

information is sought, or in some cases both.[2]   In addition, Morse and Jackson filed response

briefs to State Farm's Motion to Compel, and Weiner and Iyetek concurred in Morse's brief.

Jackson filed an independent motion to quash the subpoenas issued to him and his firm, as well

as those issued to various entities seeking his information.

The parties presented arguments on both motions at a hearing held on September 25,

2013.   The Court subsequently sought supplemental briefing on the limited issue raised at the

hearing regarding the scope of discovery in a civil RICO action.   That briefing is now complete

and the motions are ready for decision.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 26 permits parties to obtain discovery "regarding any

nonprivileged matter that is relevant to any party's claim or defense."   Rule 26(b)(1).   Relevance

in the context of discovery is not as constrained as in the context of trial, and information

---

issued or complied with absent notice to them and an opportunity to object.

[2] As the objections to these subpoenas are many and varied, the Court will address them in the
separate analysis sections below.

relevant in the discovery phase "need not be admissible at trial if the discovery appears

reasonably calculated to lead to the discovery of relevant evidence."   *Id.*   Where a party has

propounded discovery but has not received adequate responses, that party "may move for an

order compelling disclosure or discovery."   Fed. R. Civ. P. 27(a)(1)-(3).   A court "may order

discovery of any matter relevant to the subject matter involved in the action" upon a showing of

"good cause."   Fed. R. Civ. P. 26(b)(1).

> Subpoenas issued to non-parties are generally treated the same as those to parties.

> > A subpoena to a third party under Rule 45 is subject to the same discovery
> > limitations as those set out in Rule 26.   *See, e.g., Martin v. Oakland
> > County*, No. 06-12602, 2008 U.S. Dist. LEXIS 84217, 2008 WL 4647863,
> > at *1 (E.D. Mich., Oct. 21, 2008) (Pepe, M.J.) (10 citations omitted).  Rule
> > 45(c)(1) requires that the party issuing a subpoena "take reasonable steps
> > to avoid imposing undue burden or expense on a person subject to the
> > subpoena."  Fed. R. Civ. P. 45(c)(1).  To determine whether a burden is
> > undue, a court must balance the potential value of the information to the
> > party seeking it against the cost, effort, and expense to be incurred by the
> > person or party producing it.   *Lowe v. Vadlamudi*, No. 08-10269, 2012
> > U.S. Dist. LEXIS 127586, 2012 WL 2887177, at *2 (E.D. Mich., Sept. 7,
> > 2012) (Lawson, J.) (*citing American Elec. Power Co., Inc. v. United
> > States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999); *EEOC v. Ford Motor
> > Credit Co.*, 26 F.3d 44, 47 (6th Cir.1994)).  That is, the Court must weigh
> > "the likely relevance of the requested material . . . against the burden . . .
> > of producing the material."  *Ford Motor Credit Co.*, 26 F.3d at 47.  Non-
> > party status is also a relevant factor.   *Lowe*, 2012 U.S. Dist. LEXIS
> > 127586, 2012 WL 2887177, at *2 (*citing N.C. Right to Life, Inc. v. Leake*,
> > 231 F.R.D. 49, 51 (D.D.C.2005)).

*United States v. Blue Cross Blue Shield of Mich.*, 2012 U.S. Dist. LEXIS 141355, 14-15 (E.D.

Mich. Oct. 1, 2012).   In addition, when evaluating a motion to quash a subpoena, the district

court may consider "whether (i) the subpoena was issued primarily for purposes of harassment,

(ii) there are other viable means to obtain the same evidence, and (iii) to what extent the

information sought is relevant, nonprivileged, and crucial to the moving party's case."  *Cleveland

Clinic Health System-East Region v. Innovative Placements*, 2012 U.S. Dist. LEXIS 7275, *5

(quoting *Bogosian v. Woloohojian Realty Corp.*, 323 F.3d 55, 66 (1st Cir. 2003)). "If the documents sought by the subpoena are 'relevant and are sought for good cause,' then the subpoena should be enforced 'unless the documents are privileged or the subpoenas are unreasonable, oppressive, annoying, or embarrassing.'" *Chao v. Local 951, United Food and Commercial Workers International Union*, 2006 U.S. Dist. LEXIS 61899, 2006 WL 2380609, at *2 (N.D. Ohio 2006) (citing *Bariteau v. Krane*, 206 F.R.D. 129, 130 (WD. Ky. 2001)).

Where a subpoena issued to a third-party seeks the information of another, generally the subject of the subpoena has no standing to seek to quash it. *Smith v. Sears, Roebuck and Co.*, No. 08-15021, 2009 U.S. Dist. LEXIS 45240, *3-4 (E.D. Mich. May 29, 2009) (collecting cases). An exception exists where the party seeking to quash is making a claim of personal right or privilege with respect to the subpoenaed information. *Id.* at *4. Pursuant to Fed. R. Civ. P. 45(c)(3)(A), a court "must" quash a subpoena that seeks disclosure of "privileged or other protected matter, if no exception or waiver applies."

A second exception to the general rule applies where the subpoena requires disclosure of confidential commercial information. *Policherla*, 2009 U.S. Dist. LEXIS 62135 at *9 (citing Fed. R. Civ. P. 45(c)(3)(B)(i)). In that instance, a court *may* quash the subpoena, *id.*, although the party seeking that relief bears a heavy burden of proof. *Smith*, 2009 U.S. Dist. LEXIS 45240 at *4. The test for whether or not such a subpoena should be quashed is one of relevance, and the initial burden is placed on the party seeking to quash to show that: (1) the information falls into a protected category; and (2) disclosure may be harmful. *Id.* Upon such a showing, the burden shifts to the requesting party to establish both (1) relevance and (2) need for the information. *Id.*

Tying together all of these rules is the overarching principle that a court has broad

6

discretion in fashioning and limiting discovery.  *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998) ("The scope of discovery is, of course, within the broad discretion of the trial court."); *Multimatic Inc. v. Faurecia Interior Sys. USA*, 358 Fed. Appx. 643, 652 (6th Cir. 2009) ("A district court has broad discretion to deny unduly broad discovery requests . . .").

## III.   ANALYSIS

### A.   Subpoena Issued to Comcast

The Court first addresses the subpoena issued to Comcast to obtain the identity of the owner of the email address autoassurance@comcast.net.   State Farm asserts that through discovery it has learned that a company by the name of Auto Assurance applied for and received an account with several crash report vendors to begin purchasing automobile crash reports. (Doc. # 110, Ex. 6; 11).   Further investigation revealed that Auto Assurance is not a separate legal entity.  (*Id.* Ex. 7).   State Farm discovered that the addresses and phone numbers of Auto Assurance were actually the same as those of entities owned by Defendants Kallil Kazan and Naim Khanafer.  (*Id.* Ex. 6; 8-10; 12-13).   State Farm alleges that Auto Assurance's account with crash report vendor Iyetek was not only opened using a fictitious company name and wrong addresses and phone numbers, but that the "company's" alleged owner "David Maskalski" misled Iyetek after it attempted to confirm that purported entity's legitimacy.  (*Id.* Ex. 15).   Once the account with Iyetek was opened, Auto Assurance purchased more than $170,000 worth of crash reports in approximately a one-year period.  (*Id.* Ex. 16).   State Farm alleges that based on Iyetek's terms and conditions for being granted an account, Defendants themselves would not have been able to open such an account – and thus obtain crash reports – rendering it necessary for them to create the allegedly fictitious Auto Assurance.   The email address associated with Auto Assurance was: autoassurance@comcast.net.  (*Id.* Ex. 6).

State Farm issued a subpoena to Comcast seeking information related to the owner of this email address.  (*Id.* Ex. 14).  Comcast objected on the basis that it is prohibited by federal statute from disclosing such information absent a court order.  (*Id.* Ex. 49).  State Farm moves this Court to compel Comcast to comply with the subpoena.  In addition, State Farm seeks an order requiring Comcast to preserve any emails from the identified account because State Farm intends to subpoena those emails if it learns that the account is in fact controlled by any of the Defendants.

Pursuant to the Cable Communications Policy Act ("CCPA"), cable service providers are not permitted to disclose subscriber or IP address information absent a court order that also requires notice to the subscriber.  47 U.S.C. § 551(c)(2)(B).  Courts have permitted disclosure of such information where it appears that the identity of the account holder is relevant to the cause of action.  *See e.g. Malibu Media, LLC v. Doe*, No. 13-14011, 2013 U.S. Dist. LEXIS 146053 (E.D. Mich. Oct. 9, 2013) (granting order where identity of subscriber necessary to determine identity of proper defendant to action).  While this statutory provision has generally been applied in the context of identifying an unknown defendant or locating a defendant for purposes of service of process,[3] the statute does not limit disclosure of such information to only those purposes.  *See e.g. Psychopathic Records, Inc. v. Anderson*, 2008 U.S. Dist. LEXIS 95788, *4-6 (E.D. Mich. 2008) (permitting subpoena seeking preservation and production of emails from address associated with defendant).

Here, State Farm has adequately shown that autoassurance@comcast.net is likely

---

[3] *See Malibu Media*, 2013 U.S. Dist. LEXIS 146053; *see also Killer Joe Nevada, LLC v. Doe*, No. 13-441, 2013 U.S. Dist. LEXIS 89707 (S.D. Ohio June 26, 2013) (identity of defendant); *Malibu Media, LLC v. Doe*, 13-12210, 2013 U.S. Dist. LEXIS 76872 (E.D. Mich. May 31, 2013) (same); *Liberty Media Holdings, LLC v. Gan*, No. 11-2754, 2012 U.S. Dist. LEXIS 39669 (D. Col. Mar. 23, 2012) (location of defendant for purposes of service).

associated with Defendants – having offered evidence tending to show that the company and possibly its alleged owner, David Maskalski, are fictitious, as well as showing that the address and phone number associated with Auto Assurance were actually addresses of other entities owned by defendants Kazan and Khanafer. This information tying Auto Assurance to Defendants, coupled with the use of the autoassurance@comcast.net email address in the company's application to (and account with) Iyetek, supports a claim that the email address itself is associated with Defendants.

Accordingly, the Court finds the evidence presented sufficient to require Comcast's compliance with the subpoena.[4] Furthermore, State Farm has requested that Comcast be ordered to preserve any and all emails originating from, or that were sent to, the autoassurance@comcast.net email account, pending identification of that account's owner. To the extent the e-mail account's owner is already a party to this case, such a ruling should be unnecessary, as parties must preserve all potentially relevant evidence, and the parties to this action were put on notice of State Farm's assertion of the relevance of these emails no later than

---

[4] Pursuant to 47 U.S.C. § 551(c)(2)(B), before producing the subpoenaed materials to State Farm, Comcast must notify Auto Assurance of this Order. Comcast requests seven calendar days to do so. (Mot. Doc. #110, Ex. 49 at 3). It also requests that Auto Assurance be given 21 days after receipt of that notice to object to this Order. [*Id.*]. However, the statute does not specify any particular length of time a cable operator has to notify its subscriber of such an order. Nor does it specify the length of time a subscriber has to file with the Court any objection to the order. Rather, the statute simply provides that, "A cable operator may disclose such information if the disclosure is * * * (B) … made pursuant to a court order authorizing such disclosure, if the subscriber is notified of such order by the person to whom the order is directed. In light of the connection between Auto Assurance and certain of the Defendants in this matter, the Court will resolve the notice issue as follows: **State Farm shall forthwith provide Comcast with a copy of this Order, and shall specifically refer it to this Section III(A). Comcast shall have seven (7) calendar days from its receipt of this Order to so notify Auto Assurance. In turn, Auto Assurance shall have ten (10) calendar days from its receipt of the notification from Comcast to file in this Court any objection it has to this Order. If such an objection is filed, then Comcast shall not produce the subpoenaed information until that objection is resolved, promptly, by the Court. If no such objection is filed, then Comcast shall produce the subpoenaed information within three business days after the objection period expires.**

their receipt of the February 8, 2013 notice of subpoena to Comcast.  (Mot. Doc. #110 at 26 n. 19).  However, out of an abundance of caution, and because State Farm only seeks at this time to require Comcast to preserve, not produce, the emails to and from this account, **the Court hereby orders Comcast to preserve emails into and from the autoassurance@comcast.net account for one hundred eighty (180) days from the date of this order, or until further order of this Court, whichever is earlier.**  *See Psychopathic Records*, 2008 U.S. Dist. LEXIS 95788, *5 (granting request to preserve information where no assurance provider will preserve emails for any specific period of time, potentially leading to the destruction of evidence).

### B.    Subpoena Issued to United States Postal Service

Similarly, State Farm issued a subpoena to the United States Postal Service to obtain the identity of the owner of Post Office Box 414 in Dearborn Heights, Michigan, to which Auto Assurance arranged for most of its monthly invoices from Iyetek and another crash report vendor be mailed.  (Mot. Doc. #110, Ex. 50).  The USPS objected to the extent that it is prohibited by regulation from disclosing such information absent a court order.  39 C.F.R. § 265.6(d)(4).  (*Id.* Ex. 51).

State Farm cited no case, and the Court has found none, where a private party has moved to compel compliance with a subpoena issued the USPS for subscriber information related to a post office box, or where the USPS has moved to quash such a subpoena.  However, the Court acknowledges the liberal breadth of discovery under the Federal Rules and further that the only objection from the USPS was that it could not release such information without a court order.  (*Id.*).  The USPS did not appear at the hearing or make any additional objections.  Furthermore, State Farm offers evidence that the post office box at issue has been used in the past by at least one of Defendant Kazan's

other chiropractic clinics (that is not a party to this litigation).   (*Id.* Ex. 24).   Because

there is evidence tending to prove that "Auto Assurance" was created by at least some

Defendants, and that the post office box in question is tied both to that company and to at

least one Defendant, the Court finds it appropriate to order the USPS to comply with

State Farm's subpoena, with the same notice procedure described in footnote 4 above.

Accordingly, **State Farm, shall forthwith provide the USPS with a copy of this**

**Order, and shall specifically refer it to this Section III(B).  The USPS shall have**

**seven (7) calendar days from its receipt of this Order to so notify Auto Assurance.**

**In turn, Auto Assurance shall have ten (10) calendar days from its receipt of the**

**notification from the USPS to file in this Court any objection it has to this Order.  If**

**such an objection is filed, then the USPS shall not produce the subpoenaed**

**information until that objection is resolved, promptly, by the Court.  If no such**

**objection is filed, then the USPS shall produce the subpoenaed information within**

**three business days after the objection period expires.**

>    **C.    Subpoenas Issued to Morse and Weiner**

During discovery, State Farm uncovered information it alleges demonstrates the *quid pro*

*quo* relationship between Defendants and various PI firms, including Morse and Weiner.   In

support of their argument, State Farm offers testimony of various insureds and other evidence.

The insureds, each of whom was represented by Morse or Weiner, implicate those law firms in

various ways; (1) some were directed by the firms to receive treatment at one of the Defendant

clinics; and (2) others were contacted by unknown persons who solicited them for treatment at

the Clinics, but their crash reports had been purchased prior to that interaction by either Morse or

Weiner.  (Mot. Doc. #110, Ex. 27-30).  Others testified that they were approached by Morse's

employee, Jackson, who arranged for an appointment with one of the Defendant clinics.  (*Id.* Ex. 43-45; 47).  In addition, State Farm alleges that it discovered information that Morse and Weiner, along with Jackson, have been illegally and unethically soliciting clients to their firms, some of which have ultimately treated with Defendants.  (*Id.* Ex. 27-48).

On the basis of the above evidence, State Farm issued subpoenas to Morse and Weiner, seeking the following eight categories of information dating back to 2007: (1) communications with Defendants about the patients who treated at Defendant Clinics and whose claims are at issue in this case (Document Request No. 1); (2) documents reflecting or related to payments to and from Defendants, including those relating to the patients at issue in this case (Document Request Nos. 2-3); (3) financial/referral arrangements with Defendants (Document Request No. 4); (4) payments for, and agreements to purchase, police reports since 2007, including those relating to the patients at issue (Document Request Nos. 5-7); (5) payments to obtain any of the patients at issue as clients (Document Request No. 8); (6) communications with and payments to Jackson since 2007, including payments to him regarding the patients at issue (Document Request Nos. 9-11); (7) documents reflecting settlement demands made by their firms regarding the patients at issue in this case (Document Request No. 12); and (8) documents reflecting disbursement of settlement or litigation proceeds for the claims of the patients at issue in this case (Document Request No. 13).  (*Id.* Ex. 56-57).

Morse and Weiner objected to the subpoenas, arguing that they seek irrelevant, privileged or confidential information, that they are overbroad, unduly burdensome, harassing, and that the information is available through other sources.  (*Id.* Ex. 58-59).  Neither Morse nor Weiner produced a privilege log with respect to their claims of privilege, and while Weiner objected to each request specifically, (*Id.* Ex. 59), Morse simply made blanket objections to the subpoena as

a whole.  (*Id.* Ex. 58).  Both Morse and Weiner responded that neither firm had any documents

relating to a financial relationship between the firms and the Defendants.  (*Id.* Ex. 58-59).

Further, Morse responded that no documents existed relating to payments made to obtain any of

the patients at issue in this suit.  (*Id.* Ex. 58).

State Farm has moved to compel Morse and Weiner to comply with the subpoena,

arguing that the information sought is relevant to explain the context of the RICO conspiracy and

that omitting evidence of solicitation would leave the jury with an incomplete story.  State Farm

further argues that the information is relevant to flesh out other potential parties to the suit,

including Morse and Weiner.  Finally, State Farm argues that the information sought is relevant

to Morse and Weiner's credibility to the extent they may be called to testify at trial.

Morse and Weiner argue that the subpoenas should be quashed in their entirety.  They

argue first that the information sought is not relevant to the claims or defenses in this action,

which they characterize as being one of simple overbilling or fraudulent billing by Defendants.

Morse and Weiner further argue that the information sought is covered by attorney-client and/or

work-product privileges.  They argue that some of the information sought is protected by HIPPA

and other confidentiality provisions such that they have no authority to disclose the information

absent client consent.  Finally, they argue that the subpoena is overbroad, unduly burdensome,

and designed to harass them as they are frequent litigators against State Farm.

Subsequent to the hearing, the Court sought additional briefing on the scope of discovery

related to a civil RICO conspiracy.  The supplemental briefs pointed the Court to numerous

cases, very few of which were directly on point to the issues raised here – the degree to which

discovery may be had of a ***third-party*** in a ***civil*** RICO conspiracy case.  On the one hand, it is

clear that State Farm is entitled to discovery tending to prove the entirety of the "scheme"

alleged, and that such proof should not be limited solely to the predicate acts which underlie the RICO charge.  As the Sixth Circuit has stated, a jury "is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void – without knowledge of the time, place, and circumstances of the acts which form the basis of the charge."  *United States v. Weinstock*, 153 F.3d 272, 277 (6th Cir. 1998) (quoting *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir. 1977)).

On the other hand, RICO is not a borderless statute that allows a civil litigant unfettered discovery simply because it charges a broad and complicated "conspiracy" that may include individuals not party to the suit.  There must be some outer limit to discovery in a civil RICO action, especially as it relates to third parties, to prevent unnecessary burden and potential harassment to those against whom no claim is alleged and whose information is not necessary to resolving the claims and defenses in the case.  Indeed, "[t]he need to reasonably limit the scope of discovery is acute for claims brought under the RICO statute.  The Supreme Court has recognized that the breadth of the RICO language encourages attempts to turn business disputes into federal racketeering charges.  Thus the risk that a party will attempt to use discovery to conduct a 'fishing expedition' is a significant concern."  *PMC, Inc. v. Ferro Corp.*, 131 F.R.D. 184, 187 (C.D. Cal. 1990) (collecting cases) (citations omitted).  That concern is especially evident here where State Farm admits that Morse and Weiner act as opposing counsel to State Farm in a large proportion of its litigated insurance claim cases.  (Mot. Doc. #110 at 13; Resp. Doc. #123 Ex. A).  Permitting limitless discovery of these firms' files, even conceding that a protective order exists in this case preventing the misuse of obtained information, could still provide State Farm with a wealth of information not truly relevant to the claims here, but which could bleed over, intentionally or unintentionally, into other cases State Farm handles against

these firms.  Against this backdrop, the Court considers Morse and Weiner's first objection – to the relevancy of the various categories of documents sought – weighs that relevancy against the potential for abuse and the burden on the producing party, and finds that Morse and Weiner have sustained their burden as to at least some of the evidence State Farm seeks to discover.

Upon a review of the allegations in the complaint, the Court finds it is able to draw a clear outline of the boundaries of relevance in this case.  State Farm alleges that PI firms, including Morse and Weiner, engaged in *quid pro quo* referral relationships with Defendants with regard to individual insureds in order to inflate the cost of their therapies, which in turn inflated the claims submitted to and paid by State Farm, resulting in larger contingency fees for the firms.  (Cplt. ¶¶ 38-39).  State Farm further alleges that Defendants adhered to a predetermined protocol with their patients that required a consistent cycle of referral and re-referral between the doctors and the Clinics.  (*Id.* ¶¶ 4-5).  In addition, State Farm alleges that a necessary component of this scheme was the referral to and/or from various PI firms with which Defendants had a quid pro quo relationship, as those firms were necessarily the ones to submit the patients' claims to State Farm based on the unnecessary and/or overprescribed treatment.  (*Id.* ¶¶ 6; 38-39).  Thus, the relevant relationships here are the ones between the firms and Defendants.  This includes the method by which the firms would refer patients to Defendants, or vice versa, but not how the firms otherwise solicited their own clients.  In short, the Court finds, on the record before it, that the boundary of relevance in this case extends as far as information relevant to the alleged "*quid pro quo*" relationship between Defendants and the firms.

The Court rejects State Farm's argument that the independent relationship between the firms and their clients lies within the relevance boundary.  State Farm spends many pages of its briefing offering evidence of the firms' allegedly illegal and unethical solicitation of clients.

15

(*See State Farm's First and Second Supplemental Briefs,* Doc. ## 115, 135).  But, whether or not their solicitation was legal or ethical is once-removed from the case at hand.  State Farm's complaint alleges a limited scheme where the critical relationships are (1) the alleged referral relationships between the firms and Defendants and (2) Defendants' relationships with their patients.  Whether the firms properly or improperly solicited their clients is of no consequence to the purpose for which those clients were referred to, or treated by Defendants.  This is because, by State Farm's own allegations, liability in this case will be determined by the medical necessity of the treatment received and billed for particular patients' care, not how the law firms may have solicited certain of those patients.  *United States v. Boone*, 628 F.3d 927, 935 (7th Cir. 2010) (noting that "the definition of the scheme itself is a limiting principle" of what constitutes relevant evidence, "in that only evidence of the same scheme as opposed to a related or distinct scheme, is admissible") (finding admissible evidence of extortion to which defendant was not a party based on both the nature of the prosecution's alleged scheme and the defense defendant presented).  Therefore State Farm's discovery requests will be permitted only to the extent they seek information about the relationships between the firms and Defendants, or between Defendants and their patients.  *See Multimatic*, 358 Fed. Appx. at 652.  ("A district court has broad discretion to deny unduly broad discovery requests . . .").

This result is in accord with the relevant cases the parties presented on the subject.  In *Crable v. State Farm Mut. Auto Ins. Co.*, No. 10-402, 2011 U.S. Dist. LEXIS 131092 (M.D. Fla. Nov. 14, 2011), the defendant, State Farm, sought documents relevant to a PI firm's relationship with a spinal clinic.  *Id.* at *3.  The documents requested of the third-party firm related specifically to the nature and extent of its relationship with the clinic where the plaintiff had treated, and whose doctor was expected to testify as an expert witness at trial.  *Id.*.  The PI firm

16

had originally represented the plaintiff and had referred her to the clinic.  *Id.* at *2-3.

After outlining the relevant discovery standards under the Federal Rules, the court ultimately permitted the discovery of several categories of documents, including the invoices from the clinic to the PI firm, as well as payments made by the firm to the clinic, for almost 200 clients who had been identified as having been referred to the clinic in other litigation.  *Id.* at *19-20.  The court based its conclusion on the fact that previous evidence adduced had divulged an extensive relationship between the clinic and the PI firm.  *Id.*  The court found the subpoenaed evidence relevant to show the extent of the financial relationship between the entities, to establish the reasonableness of the plaintiff's care, and because "they may go to the heart of the truth seeking function and fairness of the trial in this lawsuit."  *Id.* at *19.

Similarly, in *Allstate Ins. Co. v. Nassiri*, No. 08-369, 2011 U.S. Dist. LEXIS 67556 (D. Nev. June 23, 2011), the court held relevant a PI attorney's referral relationship with defendant doctors and clinics that were engaging in conduct similar to that alleged here.  *Id.* at *3-5.  In that case, the court permitted deposition testimony to be taken of the attorney related specifically to his relationship with the defendants due to the fact that he represented a majority of the subject claimants.  *Id.* at *6-9.  The court restrained plaintiffs in that case by permitting counsel for the attorney to object to "any matter unrelated to the case" and limited the attorney's testimony to his "awareness of the defendants' acts, the change, if any, to the relationship once he learned of the defendants' practices, and his overall referral relationship with the defendants."  *Id.* at *9.

Judge Drain of the Eastern District of Michigan recently came to a similar conclusion in *MedCity Rehab. Srvc. LLC v. State Farm Mut. Auto. Ins. Co.*, No. 11-14777, 2013 U.S. Dist. LEXIS 110835 (E.D. Mich. Aug. 7, 2013).  Although the relationship between the PI attorney and the clinic in that case was even more intimate, in that the attorney was actually the owner of

17

the clinic, the court found similar categories of documents relevant to establish the relationship among the attorney, clinic and doctor involved in that case. *Id.* at 9-10 (permitting discovery of referral relationships, financial motives and distribution of settlements, among others).

Notably, in all three cases mentioned above, as well as in all of the other cases State Farm presented on the subject, the scope of discovery was limited to the relationship between the third-party and the defendant in the case. *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1565-66 (1st Cir. 1994) (claims submitted to other insurers permitted where entity submitting claims was defendant); *State Farm Mut. Ins. Co. v. Policherla*, 2009 U.S. Dist. LEXIS 62135, (E.D. Mich. Jul. 20, 2009) (discovery of defendant permitted relating to claims that defendant made to other insurers); *United States v. Weinstock*, 153 F.3d 272 (6th Cir. 1998) (holding admissible certain uncharged against defendant for purposes of establishing pattern of scheme); *United States v. Oleo*, 697 F.3d 338, 344 (6th Cir. 2012) (holding evidence of other fraudulent clinics run by defendant but not charged in indictment admissible to show knowledge, intent or plan and even if not would be admissible to complete story of scheme, like how defendant met other participants, etc.); *United States v. Passarella*, 788 F.2d 377, 382-83 (6th Cir. 1986) (evidence of uncharged co-conspirator's counterfeiting activity in which defendant did not participate nevertheless relevant to defendant's knowledge where both testified to discussing such crimes with defendant).  In no case cited was there any mention of the requesting party seeking, let alone the court permitting, discovery related to the separate relationship between the third-party and another third-party unless that relationship related directly to the defendant's culpability. *See Boone*, 628 F.3d at 935 (evidence of extortion by and against others relevant to rebut defendant's defense of lack of knowledge of the scheme).  Indeed, the court in *Nassiri* specifically preempted any potential foray into that realm as being something that would permit

18

counsel's objection at the deposition.  *Nassiri*, 2011 U.S. Dist. LEXIS 67556 at *9.  Here, the Court finds that information about the "*quid pro quo*" relationship between Morse and Weiner and the Defendants, and between Defendants and their patients, is relevant as these relationships relate directly to Defendants.  However, the manner in which Morse and Weiner solicited their own clients is outside the scope of the referral of those clients to Defendants, is irrelevant to the claims and defenses in this action, and thus is not discoverable at this juncture from the non-party firms.

In sum, the Court finds that categories 1-3 relate directly to the relationship between Defendants and the firms – whether the firms and Defendants had an overt referral relationship and if so what the terms of that relationship were.  Categories 4 and 5 are irrelevant as they relate only to the methods by which the firms solicited their clients.[5]  Category 6 is relevant only with respect to communications between the firms and Jackson relating to the referral of clients to and from Defendants.  Categories 7 and 8 are relevant to the extent that they relate to settlement demands to and disbursements of settlement proceeds from State Farm.  *See MedCity*, 2013 U.S. Dist. LEXIS 110835 at *9-10 (permitting discovery of settlement disbursements from defendant insurance company).[6]  Also with regard to Category 8, while the relevance of settlement demands and settlement disbursements is clear as it relates to State Farm, both in terms of evidence of liability and of damages, as well as proving the relationship among the entities, State Farm, in its briefs, has failed to articulate the relevance of such disbursements from other

---

[5] To the extent payments to obtain patients as clients could refer to payments made to Defendants, that would already be swept up by Category 2.

[6] However, since State Farm would have received any settlement demands made to it, then absent a particularized showing that it no longer possesses those demands – a showing which State Farm has not made – the Court declines to burden the firms with having to produce them.

19

insurance companies, and the Court does not find the relevance of this information readily apparent.[7]  As discussed above, the mere allegation of a RICO claim alone is not sufficient to render all desired discovery relevant under its umbrella.  (*See supra* pp. 15-18).

To the extent that State Farm offers two other specified reasons why it is entitled to receive information from the categories the Court has found irrelevant to this action, the Court is not persuaded.  First, State Farm argues that the information is necessary to allow it to determine whether it should add the firms as parties to the action.  However, discovery is not a fishing expedition, and the desire to investigate other entities to determine whether they should become parties to a case is a misuse of the broad leniency offered by the Federal Rules.  A complaint is not "a hunting license to discovery whether, in fact, a viable claim may be alleged . . .  The discovery rules are designed to support a properly pleaded cause of action and to prepare for defenses to charges made – not to discover whether a claim exists."  *McCurdy v. Wedgewood Capital Mgmt. Co.*, No. 97-4304, 1998 U.S. Dist. LEXIS 18875, *39-41 (E.D. Pa. Nov. 16, 1998) (holding that discovery request related to un-pleaded RICO claim exceeded scope of discovery of present matter) (quoting *American Comm. Ass'n. Local 10, I.B.T. v. Retirement Plan for Employees of RCA Corp. and Subsidiary Cos.*, 488 F. Supp. 479, 484 (S.D.N.Y. 1980) *aff'd without op.*, 646 F.2d 59 (2d Cir. 1980).

Second, State Farm argues that discovery related to the firms is relevant for purposes of testing the credibility of the firms' attorneys who may be called to testify at trial.  Again, the Court is not persuaded by this argument.  The Court notes that almost any discovery request can

---

[7] Although State Farm is seeking only demands and disbursements related to the patients at issue in its complaint, the Court notes that those patients' claims may not have been solely against State Farm, but possibly against other insurers or parties as well.  Thus to the extent those patients were also litigating or seeking settlements against non-State Farm parties, their settlement demands and disbursements are not discoverable at this juncture.

be characterized as seeking information relating to credibility, and "[o]pening the door to untrammelled discovery regarding any topic that might be used for impeachment strains the outer limits of discovery 'reasonably calculated to the discovery of admissible evidence.'" 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus <u>Federal Practice and Procedure</u> § 2015 (3d ed. 2010) (quoting Fed. R. Civ. P. 26).  Moreover, State Farm has not proffered a specific scenario under which these attorneys would be called to testify at trial, nor has it alleged that these attorneys have been placed on either State Farm's or any of the Defendants' witness lists, which presumably have already been tendered per the Court's scheduling order.  [88]. Because there has been no showing that an attorney from either firm is likely to testify in this case, the Court declines at this juncture to permit State Farm to compel this discovery solely for the purpose of testing the credibility of these potential witnesses.

With regard to those categories of discovery the Court has found State Farm is entitled to receive, Morse and Weiner's remaining objections to their discoverability are insufficient.  To the extent Morse and Weiner argue that the original subpoenas are overbroad or seek irrelevant information, the Court has addressed those concerns by limiting the categories of information to be disclosed.  To the extent the firms argue that the subpoenas are meant only to harass them, the Court disagrees, and finds that at least the categories of information allowed are highly relevant to this action and thus discoverable.  In addition, the Court notes the presence of the protective order in this case which restricts the use of confidential information to the instant case.

The firms' objection that the discovery requests are unduly burdensome is mooted in part by the fact that the Court has limited the requests of the original subpoena.  *American Elec. Power Co. v. United* States, 191 F.R.D. 132, 136 (S.D. Ohio 1999) (when assessing undue burden, a court considers among other things "such factors as relevance, the need of the

[requesting] party for the documents, [and] the breadth of the document request . . .").  To the extent the argument is not mooted, the firms have not adequately shown burden.  *See Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 425 (6th Cir. 1993).  Moore's contention that it would take over 500 hours of attorney time to review and produce the requested information from 53 client files, (Morse Resp. at 9), was not only challenged by the Court at the hearing, but no longer exists given the Court's substantial narrowing of the subpoena.  *See e.g. EEOC v. Quad/Graphics*, 63 F.3d 642 (7th Cir. 1995) (finding subpoena not unduly burdensome where affidavit asserting burden was deemed inflated and exaggerated); *Vaughn v. City of Shaker Heights*, 2013 U.S. Dist. LEXIS 126094, *17-18 (N.D. Ohio Sept. 4, 2013) (finding moot argument of undue burden in light of Court's narrowing scope of subpoena). The argument that the documents could be obtained from other sources is also a non-starter. State Farm asserts that it did not seek the exact same documents from Defendants nor could it, as many of the documents sought are uniquely possessed by the firms.  (Reply, Doc. #131 at 3-4). And, "there is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that the party must first seek those documents form an opposing party before seeking them from a non-party."  *Software Rights Archive, LLC v. Google, Inc.*, 2009 U.S. Dist. LEXIS 43835, *6 (D. Del. May 21, 2009) (quoting *Coffeyville Res. Ref. & Mktg. LLC v. Liberty Surplus Ins. Corp.*, 2008 U.S. Dist. LEXIS 91224, *5 (E.D. Ark. Nov. 6, 2008).  In addition, the fact that the firms and Defendants have e-mailed or written each other does not mean that both currently possess all of those communications.  Time and technology both work against State Farm's ability to ensure it has a complete record of the relationship between the firms and Defendants, and it is entitled to ensure the completeness of its record by seeking the same documents from multiple sources.

Finally, the firms' argument that the information sought is privileged or otherwise confidential is not well-taken.  Morse did not respond to the subpoena with objections to specific requests, neither firm complied with the Rule 26 requirement that the party "describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A)(ii)..  To the extent any of the documents sought under the Court's modified subpoena contain privileged information, the firms may assert privilege over them by providing to State Farm a proper privilege log that it can assess and challenge if necessary.

For all of these reasons, **with respect to the subpoenas served on the law firms, the Court grants State Farm's motion to compel as to requests for production 1-4, 9-11 (but only to the extent the communications sought relate to Defendants), and 13 (but only regarding disbursement of settlements from State Farm), and denies it as to requests for production 5-8, and 12.  (*See* Mot. Doc. #110 Ex. 56, 57).  The firms are ordered to produce responsive documents by January 6, 2014, and to the extent they seek to assert any privilege over such documents, they are ordered to provide State Farm with a proper privilege log by that same date.**

**D.      June 3, 2013 Subpoena Issued to Iyetek**[8]

State Farm issued a subpoena to Iyetek on June 3, 2013, seeking the invoice and billing information for purchases of crash reports made by Morse, Weiner and Nathan French.  Iyetek

---

[8] State Farm also issued a subpoena Iyetek in February 2013 seeking invoices and account information for Auto Assurance.  After Iyetek only partially complied with the subpoena, State Farm moved to compel Iyetek's full compliance.  Since that date, Iyetek has tendered the information State Farm was seeking and thus State Farm has withdrawn its motion in relation to that subpoena.  [129 at 2].

objects to the subpoena on its customers' behalf, arguing that the information is not relevant to the claims or defenses of this case, and joins in Morse's opposition brief.

As stated previously, this Court draws a line around the alleged RICO conspiracy in this case which ends with the referral relationship between the firms and the Defendants.  Just as the Court found that State Farm's request from the firms for crash report payments made to various vendors was not relevant to this conspiracy, neither is the same information relevant coming from Iyetek.  Again, the way the firms solicit their own clients is of no consequence to whether those clients are properly or improperly referred to Defendants, and it is that relationship that is important to this case.  Therefore, **State Farm's motion to compel Iyetek's compliance with the June 3, 2013 subpoena is denied.**[9]

### E.    Subpoenas Issued to Jackson

State Farm also seeks compliance with two subpoenas it issued to Jackson.  The subpoenas seek: (1) communications and financial records reflecting payments and financial arrangements between Jackson and Defendants (Requests 1-3); (2) documents related to Jackson's referral of patients to Defendants (Request 4); (3) records reflecting payments made to individuals to undergo treatment at Defendant clinics (Request 5); (4) communications between Jackson and Morse and Weiner (Requests 7-8); (5) records of payments between Jackson and Morse and Weiner (*id.*); (6) communications between Jackson and government regulators and

---

[9] While State Farm includes in its request for relief a motion compelling Iyetek to also produce the records of Nathan French, State Farm's voluminous briefing makes scant mention of French or the participation of his firm in the alleged illegal solicitation or in the alleged *quid pro quo* relationship with Defendants.  Moreover, French is not mentioned in the complaint, unlike Morse and Weiner.  At the same time, French did not appear before the Court to object to the subpoena in any way, although it is unclear whether he was ever notified of the subpoena.  However, because the Court has broad discretion to manage discovery, (*Multimatic*, 358 Fed. Appx. at 652), and because the Court finds below that the documents requested in the Iyetek subpoena to be irrelevant to the claims and defenses in the present action, it extends its ruling to records relating to Nathan French despite the lack of objection on his part.

investigators (Request 8); (7) communications with patients at the Clinics (Requests 9-10); and (8) records of Jackson's traffic crash report purchases (Requests 11-12).

Jackson objects to the subpoenas and moves to quash them, claiming that the information sought is not relevant to the claims or defenses in this case. In addition, he argues that all the information sought is covered by the investigator-client privilege, which he claims in Michigan extends more broadly than even the attorney-client privilege. Finally, Jackson argues that he would be unduly burdened in complying with the subpoenas. State Farm responds that the information is relevant to the RICO conspiracy alleged in its complaint, and notes that Jackson's solicitation of clients on behalf of Defendants is specifically alleged therein. Moreover, State Farm argues that the investigator-client privilege does not apply at least to information prior to October 2010 (because Jackson only received his investigator license at that time, and thus could not have been working as a private investigator before that point in order to take advantage of the privilege), and does not apply thereafter because only federal rules of privilege apply where federal causes of action are alleged. With regard to the attorney-client privilege, State Farm argues that the categories of information sought are likely not privileged, and in any event Jackson has failed to specifically assert privilege over any individual document such that State Farm could assess his claim. Finally, State Farm argues that any privilege Jackson could assert is trumped by the crime-fraud exception, as the information sought directly relates to his assistance to Defendants in perpetrating fraud on State Farm.

Incorporating the Court's earlier discussion regarding relevance of the information sought, the Court finds that the first three categories outlined above easily past the relevance test. State Farm's complaint specifically alleges that Jackson solicited patients directly to treat at the clinics and therefore State Farm is entitled to explore the extent of that relationship as it relates to

whether those referrals were properly or improperly motivated.  Categories 1-3 above include information relevant to that inquiry.  Categories 4 and 5, however, may include some relevant information, but are overbroad as currently drafted.  State Farm's request for all communications and all payments made between Jackson and Morse and Weiner is destined to snare much more information than what is relevant to the claims and defenses in this case.  State Farm argues that the illegal solicitation of accident victims generally is an essential part of the underlying scheme and is specifically alleged in the complaint.  (Reply, Doc. #130 at 2).  However, as discussed above, this is true only to the extent that the solicitation was on Defendants' behalf.  The firms' proper or improper solicitation of their clients whether involving Jackson or not is neither an element of the fraudulent billing scheme nor alleged in the complaint as being such.  Thus, to the extent that Jackson's communications with and payments to and from the firms are relevant at all, it is only so to the extent the communications and payments involved Jackson's participation in referring Morse and Weiner clients to Defendants.

The same logic applies to the request for Jackson's traffic crash report purchase records (Category 8).  Those records are only relevant to the extent Jackson was purchasing accident reports directly on Defendants' behalf.  Jackson's communications with Defendants' patients (Category 7) are relevant as well, but only to the extent they involve Defendants as the subject matter, not other unrelated subjects, such as might arise in the context of those patients' independent relationships with Jackson or his employer, Morse.  Finally, State Farm has not explained, either in briefing or at the hearing, the relevance of its request for Jackson's communications with government regulators and investigators (Category 6), and the Court will not attempt to guess at any potential relevance of those materials.

With regard to those categories of information the Court has found to be relevant, a

26

second question of privilege arises.  Jackson argues that the investigator-client privilege or the attorney-client privilege applies to all of the requested documents.  State Farm argues that the investigator/client privilege could not have applied prior to October 2010 when Jackson became licensed as an investigator, that the attorney-client privilege does not apply to the categories of documents requested, and that even if the privilege did apply, Jackson's perpetuation of the firms' and Defendants' alleged fraud against State Farm renders those documents discoverable under the crime-fraud exception to the privilege.

As discussed above in relation to the firms' allegedly privileged documents, here again the Court cannot assess whether any privilege applies to these documents, or for that matter whether the crime-fraud exception would apply to thwart such privilege, as no privilege log has been produced (or apparently even created).  Jackson argues that the investigator-client privilege is so extensive and covers so much information that it prevents even the production of a privilege log.  However, as State Farm points out, under Federal Rule of Evidence 501, federal common law controls issues of privilege unless the claim or defense under which the privilege is asserted is one for which state law supplies the rule or decision.  Fed. R. Evid. 501; *see also Moss v. Unum Life Ins. Co.*, 495 Fed. Appx. 583, 595 (6th Cir. 2012)(where "the underlying claim is based on federal law, federal common law determines the extent of the privilege"); *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1991) (federal common law of privilege applies even where complaint asserts pendant state law claims, and finding no physician-patient privilege where federal common law does not recognize one).  Here, the claims State Farm alleges that involve the *quid pro quo* referral relationship are all RICO claims under federal law.  (*See generally* Cplt. Doc. #1).  Therefore, federal law supplies the rule of decision with regard to those cases and thus governs issues of privilege, and federal common law does not recognize a

27

privilege with respect to private investigators.  *Ubiquiti Networks, Inc. v. Kozumi United States Corp.*, No. 12-66, 2013 U.S. Dist. LEXIS 158727, *2 (N.D. Fla. Feb. 13, 2013) (federal common law has never recognized an private investigator privilege).  To the extent Jackson argues that, as attorney Morse's employee, he falls under the attorney-client privilege umbrella, it is hard to imagine a scenario where assertion of that privilege would prevent Jackson from disclosing sufficient information regarding the documents and communications involved to permit State Farm to properly assess his privilege claims.  Therefore State Farm is entitled, at the very least, to a privilege log with which to assess Jackson's privilege claims.

Finally, Jackson's unsupported claim of undue burden is not well taken.  As noted above, any requirement for a third-party to comply with a subpoena will generate some burden in time and expense.  Here, where the Court has limited the categories of information that must be disclosed, and where Jackson has not supported his claim of burden by affidavit or otherwise, his bare assertion is insufficient to permit refusal to comply with the subpoena in its entirety.  *See Great Lakes Anesthesia, PLLC v. State Farm Mut. Auto. Ins. Co.*, 2011 U.S. Dist. LEXIS 111668, *12 (E.D. Mich. Sept. 29, 2011) (holding that responding party "cannot rely on a mere assertion that compliance would be burdensome") (quoting 9A Wright & Miller, Federal Practice and Procedure § 2463.1).

In summary, **the Court grants State Farm's motion to compel with respect to Jackson as follows:  Granted as to requests for production 1-5; granted as to request 6 and 7, but only to the extent that the communications or payments relate to referral of patients or clients to Defendants; denied as to request 8; granted as to requests 9 and 10, but only to the extent the communications involve Defendants as their subject matter; and denied as to requests 11 and 12.  (*See* Mot. Doc. #110 Ex. 52-53).  The Court further orders Jackson to**

28

**either disclose the above-permitted information or create a privilege log that can be evaluated and potentially challenged by State Farm.  The documents and/or privilege log shall be produced by January 6, 2014.  Jackson's motion to quash [133] is granted in part and denied in part consistent with the foregoing.**

### F.      Subpoenas Issued to Non-Parties Requesting Information Related to Jackson

Finally, Jackson has moved to quash nine subpoenas he alleges were issued to various entities seeking his information.  State Farm responds that eight of Jackson's nine challenges are moot in that six of the subpoenas it issued, to Cellco Partnership, Sprint, Comerica Bank, PNC Bank, Bahiya Fawaz and Paramount Accounting Services, were for documents completely unrelated to Jackson or his firm.  (Resp. Doc. #137 at 5-7).  While the other three subpoenas, to T-Mobile, IDT and TracFone were issued seeking records related to a phone number associated with Jackson, both T-Mobile and IDT have responded that they do not possess such information, and thus the motion to quash with respect to those subpoenas is also moot.  (*Id.* at 3-5).  Thus, State Farm's subpoena to TracFone is the only one outstanding that seeks information related to Jackson.

As stated above, generally subjects of a subpoena have no standing to challenge the validity of subpoenas issued to other parties seeking their information.  *Smith*, 2009 U.S. Dist. LEXIS 45240 at *3-4.  The exception applies where the information sought is either privileged or confidential.  *Id.* at *4.  A finding that information is privileged requires a court to quash a subpoena, while a finding that the information is confidential merely permits a court to quash a subpoena.  Fed. R. Civ. P. 45(c)(3)(A); (c)(3)(B)(i).  The party seeking the information can trump the designation of confidentiality by demonstrating appropriate need and by ensuring that protections are put in place to maintain, as best as possible, the information's confidentiality, and

ensures the subpoenaed person is reasonably compensated.  Fed. R. Civ. P. 45(c)(3)(C).

Here, Jackson has no legitimate expectation of privacy in his cell phone records, at least to the extent those records reveal only the incoming and outgoing calls.  *See United States v. Skinner*, 690 F.3d 772, 778 (6th Cir. 2012) (citing *Smith v.* Maryland, 442 U.S. 735, 744-45 (1979) (holding defendant had no reasonable expectation of privacy in numbers dialed on phone).  Furthermore, Jackson has made no argument that these records are either privileged or confidential.  Finally, these records, to the extent they reveal communications between Jackson and Defendants, are relevant to expose the nature and breadth of the relationship between Jackson and Defendants.  **For these reasons, the portion of Jackson's motion to quash [133] related to this matter is denied.**

## IV.   CONCLUSION

For the foregoing reasons, State Farm's Motion to Compel **[110]** is **GRANTED IN PART AND DENIED IN PART** as described more specifically above.  Jackson's Motion to Quash **[133]** is **GRANTED IN PART AND DENIED IN PART** as described more specifically above.

**IT IS SO ORDERED.**

Dated: November 26, 2013                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties' attention is drawn to Fed. R. Civ. P. 72(a), which provides a period of fourteen (14) days from the date of receipt of a copy of this order within which to file objections for consideration by the district judge under 28 U.S.C. §636(b)(1).

**<u>CERTIFICATE OF SERVICE</u>**

     The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

                                            s/Eddrey O. Butts
                                            EDDREY BUTTS
                                            Acting Case Manager

Dated:  November 26, 2013